GRAVES LAW OFFICE, P.C.
Philip J. Graves (SBN 153441)
pgraves@graveslawpc.com
Kevin I. Shenkman (SBN 223315)
kshenkman@graveslawpc.com
James Ahn (SBN 243335)
jahn@graveslawpc.com
Marjorie A. Witter (SBN 250061)
mwitter@graveslawpc.com
Fredricka Ung (SBN 253794)
fung@graveslawpc.com
12121 Wilshire Blvd., Ste. 775
Los Angeles, California 90025
Telephone:  (310) 295-6500
Facsimile:  (310) 295-6501

Attorneys for Plaintiff/Counterdefendant
STAMPS.COM INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STAMPS.COM INC.,<br><br>               Plaintiff and<br>               Counterdefendant,<br><br>   v.<br><br>ENDICIA, INC., et al.<br><br>               Defendant and<br>               Counterclaimant,<br><br>And Related Counterclaims. | CASE NO. CV06-7499 ODW (CTx)<br><br>**STAMPS.COM INC.'S OPENING<br>CLAIM CONSTRUCTION BRIEF** |

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I    INTRODUCTION ................................................................ 1

II   SUMMARY OF THE TECHNOLOGY ........................................... 2

    A    The Stamps.com Patents-In-Suit.............................................. 2

    B    The Accused PSI Products .................................................... 4

III  LAW OF CLAIM CONSTRUCTION.......................................... 5

    A    Governing Law................................................................. 5

    B    Means plus Function Limitations ........................................... 7

IV   TERMS REQUIRING CONSTRUCTION ..................................... 7

    A    Postage Indicia ('597 Patent claim 7; '980 Patent claim 35)................... 7

    B    Closed Metering System ('991 Patent, claim 7) ............................. 9

    C    Portable Processor Device ('991 Patent, claims 7 and 76); Portable
        Memory Device ('991 Patent, claim 42) ................................. 12

    D    Passed Blindly ............................................................... 14

    E    Independent Value Credits / Independent Postage Value Credits ......... 15

    F    Plurality of Portable Memories ('777 Patent, claim 3)........................... 17

    G    Shorthand Information ('777 Patent, claim 50; '214 Patent, claim 89);
        Summarily Indicating a Desired Piece of Information ('777 Patent, claim
        63) ............................................................................. 17

    H    Postal Indicia ('808 Patent, claims 32, 39) ............................... 20

    I    Means-Plus-Function Limitations ......................................... 21

V    CONCLUSION................................................................25

1

## **TABLE OF AUTHORITIES**

2

**Cases**

Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374 ........................ 22

CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co., 224 F.3d 1308 ............. 10

Comark Communs. v. Harris Corp., 156 F.3d 1182, 1187 ............................... 13, 14

Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560 .................................... 14

Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565 ............................................ 12

Honeywell Inc. v. Victor Company of Japan et al., Ltd., 298 F.3d 1317 ............... 10

*In re Freeman*, 573 F.2d 1237 ................................................................................ 22

Intamin Ltd. v. Magnetar Tech., Corp., 483 F.3d 1328 .......................................... 11

Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d at 865, 855 ............ 6, 14, 18

Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 ........................... 6, 17-19

Nystrom v. TREX Co., 454 F.3d 1136 ...................................................................... 9

Omega Engineering, Inc. v. Raytek Corp., 334 F.3d 1314 ..................................... 19

Phillips v. AWH Corp., 415 F.3d 1303, 1315-17, 1323 ............... 5, 6, 10, 12, 13, 21

Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d at 1428, 1420 .............. 7, 21

Sunrace Roots Enter. Co., LTD v. SRAM Corp., 336 F.3d 1298, 1303 ............ 6, 19

Wang Labs. v. Am. Online, Inc., 197 F.3d 1377, 1382-83 ................................. 9, 21

WMS Gaming, Inc. v. International Game Tech., 184 F.3d 1339 ........................... 22

**Statutes**

35 U.S.C. § 112(6) ................................................................................................... 7

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

# MEMORANDUM OF POINTS AND AUTHORITIES
## I. INTRODUCTION

Salim Kara, who was recognized by the United States Postal Service in March 2000 "as the inventor who first produced digital postage, a revolutionary development in postage payment technology," is a named inventor on over 40 U.S. Patents. In April 2001, Stamps.com acquired the entire patent portfolio of the company that Kara founded, E-Stamp Corporation, which owned the rights to Kara's patents in the field of Internet postage. In addition, Stamps.com itself has, since the late 1990's, invested millions of dollars in developing its own Internet postage technology. Six of the eight patents remaining at issue derive from the inventive genius of Kara and other inventors at E-Stamp; two result from the efforts of Stamps.com inventors.

This case is now before the Court for claim construction. As instructed by the Court, Stamps.com has selected 15 claims, from eight of the original eleven patents in suit, to take to trial. (Exs. 2-9) The vast majority of the terms in these claims have a well understood plain English meaning, and accordingly need not be submitted to the Court for construction. Thus, Stamps.com requests that the Court construe only eleven terms and phrases from the patents, in addition to the means-plus-function limitations of the asserted claims.

The reports provided by the experts retained by defendants Endicia, Inc. and PSI Systems, Inc. ("collectively, "PSI") suggest that PSI intends to propose a series of constructions that limit the claims to specific embodiments of the inventions described in the specifications of the patents. The Federal Circuit has strongly and repeatedly condemned exactly the type of "construction" that PSI would propose, cautioning that the claims of a patent should ordinarily <u>not</u> be limited to the preferred embodiments or specific examples described in the specification. A patentee is not required to disclose an embodiment corresponding to every claim; if they were, patents would bear the characteristics of owners manuals or engineering

1

textbooks and would run to hundreds of pages long.  To the contrary, the Court must look to how one of skill in the technical field at issue would understand the terms used in the claims, using the specification as a guide but not a straitjacket. As Stamps.com explains below, by reference to the testimony of Prof. Patrick McDaniel, a tenured professor of Computer Science at Pennsylvania State University, as well as the testimony of PSI's own experts and several technical dictionaries, all of the terms to be construed have a well understood meaning in the field of computer science that is not limited to specific embodiments described in the specifications of the patents.

In addition, Stamps.com submits its identification of corresponding structure for the various "means plus function" limitations of these claims, in the claim charts attached as Exhibit 1.  Contrary to the standard method of construing claim terms, a claim limitation recited in means plus function language is construed by reference to the structure described in the specification (the "means") that corresponds with the function recited in the claim, as well as any equivalents thereof.  Here, PSI's expert has asserted that numerous means plus function limitations are invalid because there is no disclosure of any corresponding structure in the specifications of the patents in suit.  As the Court will see from the attached claim charts, this assertion is specious.

## II.  SUMMARY OF THE TECHNOLOGY

### A.    The Stamps.com Patents-In-Suit

Prior to the inventions of the patents-in-suit,[1] postal customers had two

---

[1] The following U.S. Patents are now at issue in this case: U.S. Patent No. 5,717,597 ("the '597 Patent") (Ex. 2), U.S. Patent No. 5,812,991 ("the '991 Patent") (Ex.3), U.S. Patent No. 6,208,980 ("the '980 Patent") (Ex. 4), U.S. Patent No. 6,233,568 ("the '568 Patent") (Ex. 5), U.S. Patent No. 6,249,777 ("the '777 Patent") (Ex. 6), U.S. Patent No. 6,889,214 ("the '214 Patent") (Ex. 7), U.S. Patent No. 6,965,451 ("the '451 Patent") (Ex. 8), and U.S. Patent No. 6,982,808 ("the '808 Patent") (Ex. 9).

STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF

1    options for purchasing postage from the United States Postal Service ("USPS"): (1)

2    purchasing traditional stamps at the post office; or (2) purchasing or renting a

3    bulky stand-alone postage meter, and periodically taking that meter to the post

4    office to be refilled with value or refilling it by modem.  In 1994, Salim Kara filed

5    a patent disclosing a new type of postage system, in which postage value was

6    stored on a memory device and attached to a customer's PC – i.e., PC Postage.

7    This set in motion the development of an entirely new industry, which has evolved

8    in tandem with the progression of patents filed by Kara and by the engineers and

9    developers at Kara's company, E-Stamp Corporation, and Stamps.com.

10        A significant step forward was taken in 1996, when Kara filed the

11   application that issued as the '991 Patent.  (Ex. 3)  The '991 Patent, for the first

12   time, disclosed that postage value could be requested by and delivered to a

13   customer over a network (such as the Internet), thereby reducing the amount of

14   security necessary on a customer's PC by utilizing the servers maintained by the

15   company providing the service.  Subsequently, with the invention of the '777

16   Patent, systems offering postage over a network could be scaled to large

17   communities of customers by employing multiple postage storage devices (e.g.,

18   disk drives storing customer account data) and by employing "shorthand data" in a

19   request for postage to make the process more efficient.  (Ex. 6)  Later, the '214

20   Patent claimed a system in which account data for multiple customers was stored

21   in each postage storage device and requests for postage were processed using a

22   highly secure cryptographic coprocessor and various encryption tools.  (Ex. 7)

23        Some of the features developed by Kara for use in conjunction with PC

24   Postage are disclosed and claimed in the '597 Patent, the '980 Patent, and the '568

25   Patent.  (Exs. 2, 4-5)  With the invention of the '597 Patent, a user could customize

26   an indicia reflective of postage having been paid to include, for example, a

27   company logo or message.  (Ex. 2)  The '980 Patent disclosed and claimed a way

28   to manage pairs of related outbound and return indicia on mail.  (Ex. 4)  The

3

1    invention of the '568 Patent discloses a system that allows a user to compare

2    postage rates of multiple providers, e.g. USPS, FedEx, and UPS.  (Ex. 5)

3         As one might imagine, several unforeseen problems arose in developing a

4    system to allow customers to use their PCs to do what only stand-alone meters

5    could do just a few years earlier.  For example, most conventional home and

6    business printers were not capable of printing postage onto envelopes according to

7    USPS specifications, using the standard tools available in Windows and other

8    operating systems.  The inventions of the '451 Patent and the '808 Patent made it

9    possible to use a standard printer to print postage using the systems developed by

10   E-Stamp and Stamps.com.  (Exs. 8-9)

11        In total, E-Stamp and Stamps.com together invested over $100 million on

12   research and development of Internet postage.  As a result of their development of

13   convenient and secure systems and methods by which a postal customer can

14   purchase and print postage, on August 9, 1999, the USPS approved the first two

15   Internet postage providers – E-Stamp and Stamps.com.  The USPS also recognized

16   Kara with its Retail Postage Technology Award, acknowledging him as the

17   "inventor of Internet postage." (Ex. 12)  Much later, PSI became the fifth company

18   approved by the USPS to be an Internet postage provider.  Without licensing, or

19   seeking to license, the E-Stamp and Stamps.com patents that reflected those

20   companies' significant investment and development of the field of Internet

21   postage, PSI began offering its own Internet postage product in 2001.

22   **B.**    **The Accused PSI Products**

23        The accused PSI products allow a PSI customer to request and print valid

24   U.S. postage from their own printer.  Each product has two central elements: the

25   client software that runs on a PSI customer's computer, and the back-end PSI

26   servers and software that respond to customer requests for postage.

27        PSI's Dazzle software, for example, provides PSI customers the ability to

28   print postage onto envelopes and shipping labels, as well as personalized fanciful

4

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

graphics such as a business logo or "Happy Birthday" message. To request postage using the Dazzle product, a PSI customer opens the application on his desktop and enters his password. Once the customer has been authenticated, he may begin entering address information and may select other parameters (such as mail class and weight) associated with the item he wishes to mail. The customer may also add a graphic or rubberstamp to the envelope if he chooses. The customer then selects "Print."

The Dazzle client software then assembles a postage request comprised of data including the customer's identity, the requested postage value, and certain parameters entered by the customer. The client software encrypts the request and sends it via the Internet to PSI's servers in Palo Alto, California. There, the PSI servers receive and begin to process the request. Using the information contained in the request, the server then accesses the customer's account data, which is stored in a database on one or more disk modules coupled to a "storage array" comprised of 45 disk modules. Once the account data has been retrieved, both the account data and the request data are loaded into an attached IBM 4758 cryptographic coprocessor. If the customer has a sufficient balance in his account to pay for the requested postage, the account balance is decremented by the amount of postage requested. The PSI software then assembles a data packet comprising the postage, and transmits it to the customer's computer. The Dazzle client software then uses this data to assemble a postage indicia, including a 2D barcode, and prints the indicia onto an envelope or other media.

## III.    LAW OF CLAIM CONSTRUCTION

### A.    Governing Law

In *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (en banc), the Federal Circuit outlined a three-step process for claim construction. First, the court must look to the language of the claims – specifically how a person of ordinary skill in the art to which the patent is directed would understand the claims in the

1  context of the entire patent, including the specification. *Id.* at 1312-13. "In some

2  cases, the ordinary meaning of claim language as understood by a person of

3  ordinary skill in the art may be readily apparent even to lay judges, and claim

4  construction in such cases involves little more than the application of the widely

5  accepted meaning of commonly understood words." *Id.* at 1314. Where a claim

6  term carries its ordinary meaning, and nothing in the patent warrants deviating

7  from this ordinary meaning, the claim construction process ends there.

8       Next, the court must always look to the intrinsic patent record, starting with

9  the patent specification. *Id.* at 1315. Of lesser importance than the specification,

10  the court should also consider the prosecution history, because "the prosecution

11  history provides evidence of how the PTO and the inventor understood the patent."

12  *Id.* at 1317.

13       While the court must construe the claims in light of the specification and

14  prosecution history, the court must also avoid reading limitations from the

15  specification into the claims. *See, e.g. Liebel-Flarsheim Co. v. Medrad, Inc.*, 358

16  F.3d 898, 906 (Fed. Cir. 2004); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863

17  F.2d 855, 865 (Fed. Cir. 1988). It is only appropriate to import a limitation from

18  the specification into a claim where (1) a patentee clearly acts as her own

19  lexicographer, (2) a patentee indicates that she regards a feature as being essential

20  to her invention, or (3) a patentee clearly disavows a broader construction by

21  distinguishing her invention over prior art. *See Sunrace Roots Enter. Co., LTD v.*

22  *SRAM Corp.*, 336 F.3d 1298, 1304-1306 (Fed. Cir. 2003) (reversing district court's

23  unduly narrowing claim construction).

24       Finally, the court may look to extrinsic evidence, including expert and

25  inventor testimony, dictionaries, and learned treatises. *Phillips*, 415 F.3d at 1317.

26  However, extrinsic evidence is "less significant than the intrinsic record in

27  determining the legally operative meaning of claim language." *Id.* (citations and

28  quotations omitted). While extrinsic evidence, especially dictionaries, may "help

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

1  educate the court," extrinsic evidence should not be used to advance a construction

2  that is inconsistent with the intrinsic patent documents.  *Id.* at 1317-19.

3  **B.    Means plus Function Limitations**

4      Special rules are applicable to construction of "means-plus-function" terms

5  under 35 U.S.C. § 112(6).  When a limitation recites "means for" performing a step

6  or function, a presumption arises that the inventor intended to invoke section

7  112(6).  *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1427 (Fed.

8  Cir. 1997).  In construing means-plus-function claim limitations, a court must first

9  define the particular function recited, and then identify "the corresponding

10 structure, material, or acts described in the specification."  *Sage Products*, 126 F.3d

11 at 1428.  The limitation is then construed to encompass "the corresponding

12 structure, material, or acts described in the specification," as well as all

13 "equivalents thereof."  35 U.S.C. § 112(6).

14 **IV.  TERMS REQUIRING CONSTRUCTION**

15 **A.    Postage Indicia ('597 Patent claim 7; '980 Patent claim 35)**

16     "Postage indicia" should be construed to mean "**a printed designation on**

17 **mail verifying that an item of mail has been posted with authorized postage,**

18 **and including an arbitrary or fanciful graphical configuration that is printed**

19 **in combination with the postal designation.**"

20     This construction is mandated by the specifications of the '597 Patent and

21 the '980 Patent – which is the most probative evidence of claim meaning.  Both the

22 '597 Patent and the '980 Patent describe systems and methods for printing a

23 <u>customized</u> indication that postage has been paid.  (Ex. 2 ['597 Patent], Abstract,

24 col. 4:54-55; Figs. 13, 15A, 15B, 16A, 16B; Ex. 4 ['980 Patent], Abstract, Figs. 13,

25 15A, 15B, 16A, 16B)  The inventor describes the printing of "information onto

26 [an] envelope [that] the Post Office can scan … to verify that an item of mail has

27 been posted with authorized postage and to track the use of postage storage

28 devices," along with a personalized graphic which might include, for example "the

7

1   name of the person whose birthday it is … and which birthday that person is
2   celebrating" as depicted in Figures 15A, 15B, 16A, and 16B of those patents. (Ex.
3   2 ['597 Patent], col.15:54-63; col. 16:56-60; Ex. 4 ['980 Patent] col. 20:22-34, col.
4   21:59, Fig. 16 (item 1604)). In fact, the inventors of the '597 Patent and the '980
5   Patent even provide a picture to demonstrate what they had in mind by the term
6   "postage indicia," specifically referring to item 1604 as "postage indicia" (Ex. 2
7   ['597 patent], col. 17:4, Fig. 16A; Ex. 4 ['980 patent], col. 21:59).

8       In light of the clear teachings of the specifications for these two patents, it is
9   not surprising that a person of ordinary skill in the art would read the term "postage
10  indicia" as used in these two patents to require not only the postage designation,
11  but also the fanciful graphical configuration. (McDaniel Decl. ¶ ¶ 10-11)

12      While PSI's expert, Prof. Douglas Tygar, agrees that the "postage indicia" of
13  the '597 and '980 patents includes a graphical configuration that is printed in
14  combination with a postal designation, PSI's construction improperly includes
15  postage that is "affixed" rather than printed, and fails to limit "postage indicia" to a
16  mark that indicates that an item of mail has been posted with authorized <u>postage</u>.
17  The only "postage indicia" discussed in the '597 and '980 patents is printed, not
18  affixed, (or at least printed on a label prior to being affixed to an envelope) and
19  verifies that authorized postage was paid for the item being mailed; indeed printing
20  a postage indicia on a piece of mail so that it can be processed by the Post Office is
21  the very purpose of the systems described in the '597 and '980 patents. Moreover,
22  PSI's vague reference to a "designation . . . reflecting a postal authorization" is far
23  broader than the term "postage," because it includes marks that are not postage.
24  The '597 and '980 Patents do not contemplate an invention that covers these non-
25  postage marks – indeed, the inventions recited in these patents would be
26  completely unnecessary to provide these types of "postal authorization."
27  Therefore, it would be improper to construe "postage indicia" to cover items that
28  are entirely outside the scope of the inventions recited in the patents. *Philips*, 415

8

1  F.3d at 1315; *Wang Labs. v. Am. Online, Inc.*, 197 F.3d 1377, 1382-83 (Fed. Cir.

2  1999); *Nystrom v. TREX Co.*, 454 F.3d 1136, 1143-46 (Fed. Cir. 2005)

3  ("'Consistent use' of a claim term throughout the specification and prosecution

4  history provides 'context' that may be highly probative of meaning and may

5  counsel against "[b]roadening of the ordinary meaning of a term in the absence of

6  support in the intrinsic record indicating that such a broad meaning was intended.")

7  **B.    Closed Metering System ('991 Patent, claim 7)**

8          The term "closed metering system" appears in the preamble of claim 1,

9  which is the independent claim from which claim 7 depends.  The term should be

10  construed as a "**network of systems for generating and printing postage,**

11  **providing multiple systems with controlled access.**"

12          First, this is exactly how one of skill in the art would understand the term, in

13  light of the specification and the prosecution file.  (McDaniel Decl. ¶ 12)  A

14  "metering system" as used in the '991 Patent is a system for generating and

15  printing postage.  (McDaniel Decl. ¶ 12-13; Ex. 15)  This is underscored by the

16  specification, which makes it clear that the metering system of the '991 Patent

17  "prints a meter stamp indicia on an envelope, label or letter . . . ."  (Ex. 3 ['991

18  Patent], col. 7:2-7)  Moreover, as understood in the field of computer science, a

19  "closed" system is a network of systems providing multiple systems with

20  controlled access.  (McDaniel Decl. ¶ 14-15; Ex. 14)  A closed system may be

21  implemented over a network, such as the Internet.  Controlled access in this

22  context refers to a system where access is restricted to a known collection of

23  entities.  (McDaniel Decl. ¶ 15; Ex. 14)  Specifically, here, a system with

24  controlled access refers to a system where access is restricted to a known collection

25  of customers of the postal metering system.  Such controlled access can be

26  established through requiring users to authenticate themselves with passwords or

27  other security tokens.  This is common practice in providing electronic services

28  such as the ones described in the patents over a public network such as the Internet.

---

9

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

1   (McDaniel Decl. ¶ 15; Ex. 14)

2       Moreover, here the patentee provided an express definition of the term in the

3   prosecution file, which is controlling.  The Federal Circuit has repeatedly held that

4   a patentee may act as his own lexicographer and set forth a definition of a claim

5   term in the specification or the prosecution history, even if that definition conflicts

6   with the ordinary meaning of the term.  *Phillips*, 415 F.3d at 1316; *Honeywell Inc.*

7   *v. Victor Company of Japan et al., Ltd.*, 298 F.3d 1317, 1323 (Fed. Cir. 2002)

8   (district court's claim construction was unduly narrow because of omission of

9   claim term's definition from the prosecution history).  Here, to overcome a

10  rejection of independent claim 1 over prior art, the patentee stated that several cited

11  references did not "teach or suggest a closed or private system, i.e., LAN or other

12  network of systems providing multiple systems with controlled access, as recited in

13  the claims."  (Exs. 10; 11, p. 374) (emphasis added)  The patentee defined a

14  "closed metering system" as a "LAN or other network of systems providing

15  multiple systems with controlled access."  (Ex. 11, p. 374)  Since a LAN, i.e., a

16  local area network, is a type of network, it would simply confuse the jury to

17  include that unnecessary verbiage in the construction of the term.

18      PSI proposes that "closed metering system" be construed as "[a] private

19  system, i.e., LAN or other network of systems, providing multiple systems with

20  controlled access (i.e., not a public system like the internet or other PSN)."  PSI's

21  proposed construction is erroneous, for the following reasons.  First, it conflates a

22  "closed" system with a "private" system.  The patentee well knew how to claim a

23  private system as opposed to a closed system – in fact, it did so at claim 25, which

24  recites "[a] computer program . . . within a private system, . . ."  (Ex. 3 ['991

25  Patent], col. 30:5-9)  Since it is presumed that a patentee that uses different terms

26  intends them to be construed differently, *CAE Screenplates Inc. v. Heinrich*

27  *Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of

28

1  any evidence to the contrary, we must presume that the use of these different terms

2  in the claims connotes different meanings."), PSI's proposal must fail.

3      Second, PSI's parenthetical exclusion of "a public system like the internet or

4  other PSN" runs directly contrary to the text of the claim as well as the

5  specification. As shown above, the '991 Patent describes a closed metering system

6  that may be implemented over the Internet or through a public switched network

7  (PSN), so long as access to the system is controlled. In fact, the specification

8  specifically states that the metering system may be implemented over a wide area

9  network, such as the Internet:

10      Moreover, processor-based systems 10 [client] and 20 [server] may be

11      located at sites remote from one another, interconnected by computer

12      network 105. Computer network 105 may be a wide area network (WAN)

13      capable of providing information communication between systems 10 and

14      20 separated by large physical distances or alternatively may be a LAN

15      providing information communication between systems 10 and 20 located

16      proximal to each other. It shall be understood that computer network 105

17      may be any information communication scheme capable of providing

18      information communication between systems 10 and 20."

19  (Ex. 3 ['991 Patent], col. 11:33-44) (emphasis added)

20      Third, PSI's proposed construction runs headlong into yet another

21  inconvenient fact – two of the very claims that depend from claim 1 recite

22  embodiment of the "system set forth in claim 1" that are implemented over "a wide

23  area network" (claim 11) and "the Internet" (claim 12). Because these claims

24  depend from claim 1, and therefore are necessarily narrower than claim 1, the

25  closed metering system" recited in claim 1 must encompass embodiments that are

26  implemented over the Internet and other wide area networks. *Intamin Ltd. v.*

27  *Magnetar Tech., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007) (an independent

28  claim impliedly embraces more subject matter than its narrower dependent claim).

11

1    In addition, claim 10 (which also depends from claim 1) recites an

2    embodiment in which the system is implemented over a local area network. PSI's

3    construction seeks to limit "closed metering system" to a system that is

4    implemented over a local area network. As the Federal Circuit discussed in

5    *Phillips*, "the presence of a dependent claim that adds a particular limitation gives

6    rise to a presumption that the limitation in question is not present in the

7    independent claim." *Phillips*, 415 F.3d at 1314-1315; *Fromson v. Advance Offset*

8    *Plate, Inc.*, 720 F.2d 1565, 1570 (Fed. Cir. 1983) (limitation present in dependent

9    claim cannot be read into independent claim). Here, PSI's proposed construction

10    would limit independent claim 1 to the narrower scope expressly stated in claim

11    10, thereby violating the *Phillips* presumption rendering claim 10 redundant.

12    Accordingly, the Court should adopt Stamps.com's proposed construction.

13    **C.    Portable Processor Device ('991 Patent, claims 7 and 76); Portable**

14    **Memory Device ('991 Patent, claim 42)**

15    The term "portable processor device" appears in claims 1 (from which claim

16    7 depends) and 74 (from which claim 76 depends) of the '991 patent. This term

17    should be construed as "**a device capable of being moved about that has a**

18    **processor and memory built into the device.**" The term "portable memory

19    device" appears in claim 40 (from which claim 42 depends), and should be

20    construed as "**a device capable of being moved about that has a memory built**

21    **into the device.**"

22    First, the claim language itself is sufficient to apprise one of ordinary skill in

23    the art as to the meaning of the term. To one of skill in the art, a processor is a

24    device that electronically executes computer logic. (McDaniel Decl. ¶ 19; Exs. 14,

25    20) A portable processor is a processor that is portable, i.e., may be moved from

26    place to place. (McDaniel Decl. ¶¶ 18, 20; Exs. 16, 18, 19) A portable memory is

27    a memory device (which may or may not contain a processor) that is portable.

28    (McDaniel Decl. ¶ 21)

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

1    Second, the specification leaves no doubt that this construction is correct.

2    Regarding the term "processor," the specification defines the portable processor as

3    "a portable device [that] is constructed with a memory and having a processor

4    controlling that memory." (Ex. 3 ['991 Patent], col. 3:16-21) There are several

5    additional optional characteristics identified as well, the list of which reiterates the

6    inclusion of "a CPU or other processor and memory built into the portable

7    processor device." (Ex. 3 ['991 Patent], col. 10:30-32). Additionally, the

8    specification identifies as the preferred embodiment "portable processor button

9    182, [which] incorporates a small disk having a memory and CPU." (Ex. 3 ['991

10   Patent], col. 10:33-34)

11        PSI's expert proposes that "portable processor" be construed as "[a] device

12   comprising a processor and volatile and/or nonvolatile memory having security

13   capabilities such as the ability to execute encryption algorithms, wherein the

14   device can be located at one of a plurality of locations while retaining its ability to

15   store and securely access one or more complete user accounts stored in its

16   memory." This construction appears to import limitations from the specification

17   into the claim, a practice that the Federal Circuit has repeatedly condemned.

18   *Phillips*, 415 F.3d at 1323; *Comark Communs. v. Harris Corp.*, 156 F.3d 1182,

19   1186-87 (Fed. Cir. 1998)

20        *Comark* is squarely on point. In *Comark*, the defendant appealed the district

21   court's construction of the claim term "video display circuit," appearing in the

22   limitation "video delay signal for receiving and delaying the video signal to

23   provide a delayed video signal." The defendant argued that "video display circuit"

24   should be construed to require compensation for delay introduced to the video

25   signal by the IF vision modulator, on the ground that this additional structure was

26   present in the preferred embodiment. The Federal Circuit rejected this argument,

27   and affirmed the district court's construction. First, the Federal Circuit noted that

28   "video display circuit" has a clear and well-defined meaning, stating that the term

13

1   "is not so amorphous that one of skill in the art can only reconcile the claim
2   language with the inventor's disclosure by recourse to the specification." *Id.* at
3   1187. The Court then rejected the defendant's invitation to limit the claims to what
4   was disclosed in the specification: "Appellant misinterprets the principle that
5   claims are interpreted in light of the specification. Although the specification may
6   aid the court in interpreting the meaning of disputed claim language, particular
7   embodiments and examples appearing in the specification will not generally be
8   read into the claims." *Id.*, citing *Constant v. Advanced Micro-Devices, Inc.*, 848
9   F.2d 1560, 1571 (Fed. Cir. 1988); *Laitram Corp.*, 863 F.2d at 865. Finally, the
10  Federal Circuit noted that the additional proposed language would violate the
11  principal of claim differentiation.

12       This Court should likewise reject PSI's convoluted construction of "portable
13  processor." As shown above, the meaning of "portable processor" is clear and
14  well-defined, and there is no warrant to limit the term to specific embodiments
15  disclosed in the specification. A processor need not have "security capabilities" (a
16  term that is itself subject to ambiguity) such as the ability to execute encryption
17  algorithms, and need not be capable of being "located at one of a plurality of
18  locations while retaining its ability to store and securely access one or more
19  complete user accounts stored in its memory." While the '991 Patent describes a
20  portable processor that has these capabilities, such as a smart disk, (Ex. 3 ['991
21  Patent], col. 10:66-col. 11:4), the claim itself does not recite a processor with those
22  capabilities and is therefore not limited to the embodiment described in the
23  specification. *Comark*, 156 F.3d at 1187. This appears to be nothing but an
24  attempt by PSI to engraft arbitrary limitations onto the claim in order to avoid a
25  judgment of infringement; an invitation to reversible error.

26  **D.    Passed Blindly**

27       The phrase "passed blindly" appears in independent claim 74 of the '991
28  patent (from which asserted claim 76 depends). "Passed blindly" is a term that

would be understood by one of ordinary skill in the art as of 1996 to mean "**to pass the information without interpreting it to determine whether to pass it along to its destination.**" (McDaniel Decl. ¶ 22) Information can be passed along a series of computers in a variety of ways. In some systems, one computer asked to pass information to another will first interpret or analyze the content of the information to determine whether it should be passed to the next computer. For example, a computer may wish to filter erroneous or fraudulent requests prior to forwarding the data to a service-providing server. This is common in the processing of email or web requests. In other systems, a computer asked to pass information will ascertain the appropriate destination for the information in question and pass that information along without first interpreting it in order to determine whether it should be passed along, i.e., without filtering the data. This is also known as transiting the data. In this context, transiting is a technical term which means forwarding without filtering. (McDaniel Decl. ¶ 22)

The term "passed blindly" is consistently used in this sense throughout the '991 patent. For example, the patent states that "[t]he commands may be handed blindly to the postage storage device by the E-STAMP program operating on system 10 or may actually be received and interpreted." (Ex. 3 ['991 Patent], col. 21:4-7). In other words, to pass information "blindly" means to pass it without interpreting it to determine whether to pass it along to its destination. (McDaniel Decl. ¶ 23)

**E.    Independent Value Credits / Independent Postage Value Credits ('777 Patent, claims 3, 50 and 63)**

The term "independent value credits" appears in claims 1 (from which asserted claim 3 depends) and 55 (from which asserted claim 63 depends) of the '777 Patent, and the term "independent postage value credits" appears in asserted claim 50 of the '777 Patent. These terms should be construed consistently with the way they are used in the specification of the '777 Patent, to mean "**data indicative**

15

1  **of the credits available to a particular user.**"

2      First, this is exactly how one of ordinary skill in the art would have

3  understood these terms as of 1998. (McDaniel Decl. ¶ 24) Second, the

4  specification compels this construction. The '777 Patent describes a system and

5  method by which "non-fungible postage is communicated from [a] metering device

6  to … remotely located processor-based systems." (Ex. 6 ['777 Patent], col. 1:30-

7  33). Postage is transmitted to a user's computer, and that user's account is

8  adjusted accordingly. (Ex. 6 ['777 Patent], Fig. 3, col. 16:55-59 – "the Meter

9  program deducts the amount of postage to be used by the postage indicia from a

10  postage credit, such as may be stored in a portable memory 15 coupled to PC 10

11  …")

12      The "postage credit" described throughout the specification is an

13  embodiment of the "independent value credits" or "independent postage value

14  credits" recited in the claims of the '777 Patent. Just as the "independent value

15  credits" are stored in portable memories according to the claims, so too is the

16  "postage credit" described in the specification of the '777 Patent. (Ex. 6 ['777

17  Patent], col. 16:55-59 (claim 3)). This "postage credit" is data that resides on a

18  portable memory (depicted as item 15 in Figure 1 of the '777 Patent) indicative of

19  the value that resides in a user's account. (Ex. 6 ['777 Patent], col. 16:55-59)

20      PSI proposes a slightly different construction for "independent value credits"

21  that would likely confuse a jury: "amount of credit available to a particular user

22  (e.g., descending register)." PSI's construction improperly construes "independent

23  value credits" as an intangible "amount of credit" rather than the tangible "data

24  indicative of credits" that is described in the specification, and referred to as

25  "postage credit". Such an intangible "amount" cannot be stored on a computer

26  device (such as the portable memories described in the specification of the '777

27  Patent) as required by the claims. Further, in a number of places in the

28  specification, the inventors refer to "amounts of postage credit," demonstrating that

16

1  the postage credit itself is not an "amount" of anything.  (Ex. 6 ['777 Patent], col.

2  7:40-43 (distinguishing "postage credit" from "amounts of postage credit")).

3  **F.    Plurality of Portable Memories ('777 Patent, claim 3)**

4  The phrase "plurality of portable memories" appears in claim 1 (from which

5  asserted claim 3 depends) of the '777 Patent.  This phrase should be construed to

6  mean **"two or more devices that are capable of being moved about that have a**

7  **memory built into the device."**  First, this is how one of ordinary skill in the art

8  would have understood the phrase in 1998.  (McDaniel Decl. ¶ 25; Ex. 17)

9  Second, the specification compels this construction.  In Figure 1B of the '777

10  patent, for example, four "portable memor[ies]" are depicted as item 15, and

11  according to the specification, are adapted to store postage credit – exactly what

12  claim 1 requires of the plurality of portable memories.  (Ex. 6 ['777 Patent], col.

13  7:17-19)  PSI agrees that a "plurality of portable memories" are "two or more

14  portable storage devices" but seeks to add the limitation that the independent value

15  credits on a given portable storage device may be modified at multiple locations.

16  However, there is nothing in the phrase "plurality of portable memories" which

17  supports importing this limitation.  Here again, PSI is asking this Court to do what

18  the Federal Circuit has repeatedly condemned – reading limitations from the

19  specification into the claims.  *See, e.g. Liebel-Flarsheim* 358 F.3d at 906.

20  **G.    Shorthand Information ('777 Patent, claim 50; '214 Patent, claim 89);**

21  **Summarily Indicating a Desired Piece of Information ('777 Patent,**

22  **claim 63)**

23  The term shorthand information appears in claim 43 (from which asserted

24  claim 50 depends) of the '777 Patent, claim 89 of the '214 Patent, and the phrase

25  "summarily indicating a desired piece of information" appears in claim 55 (from

26  which asserted claim 63 depends) of the '777 Patent as part of the function of a

27  means-plus-function element.  Both of these phrases describe the same feature

28  discussed in the specifications of the '777 Patent and the '214 Patent – the ability

17

1    for a user to input a few keystrokes to identify a larger desired item of information.

2    Consistent with this description in the specification, "shorthand information"

3    should be construed to mean **"information that identifies a larger set of**

4    **information,"** and "summarily indicating a desired piece of information" should

5    likewise be construed to mean **"providing information that identifies a larger**

6    **desired item of information."**

7        First, shorthand information was readily understood by one of ordinary skill

8    in the art in 1998 as referring to information that identifies a larger set of

9    information. (McDaniel Decl ¶ 27). Similarly, the phrase "summarily indicating a

10   desired piece of information" refers to the same concept, and likewise would have

11   been understood by one skilled in the art. (McDaniel Decl. ¶ 27) Second, this

12   important feature is described several times in the specifications of the '777 Patent

13   and the '214 Patent, as referring to information that identifies a larger set of

14   information, such as shorthand for a destination address. (Ex. 6 ['777 Patent], col.

15   3:63-65, 16:20-32; Ex. 7 ['214 Patent], col. 4:10-12; 18:24-35)

16       PSI agrees that "shorthand information" is information that correlates to a

17   larger set of information, and that the phrase "summarily indicating a desired piece

18   of information" refers to the same feature of the invention of the '777 Patent.

19   However, PSI seeks to also add the additional limitation that the "larger set of

20   information" be stored in a database. There is nothing in the term "shorthand

21   information" which supports importing this additional limitation, and therefore it

22   would be improper to import such a limitation into this claim language. *See, e.g.*

23   *Liebel-Flarsheim*, 358 F.3d at 906; *Laitram Corp.*, 863 F.2d at 865. PSI's attempt

24   to import this additional limitation into the construction of "shorthand information"

25   is also impermissible because where the patentees wanted to incorporate this

26   limitation, they did so expressly, such as in claim 14 of the '777 Patent, which

27   reads: "… means for storing information to be utilized with said selected amount

28   of value selectable from shorthand information provided in said demand." (Ex. 6

18

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

['777 Patent], col. 19:55-57) The structure recited in the specification for storing the recited information is precisely the database that PSI seeks to import into the construction of "shorthand information." Where, as here, a limitation is expressly recited in some claims, and not in others, there is a heavy presumption that the claims without the expressly recited limitation are not so limited. *Liebel-Flarsheim*, 358 F.3d at 910; *Sunrace Roots*, 336 F.3d at 1303.

Further, PSI seeks to construe "shorthand information" and "summarily indicating a desired piece of information" as requiring information that "selects" a larger set of information. In this regard, PSI's construction simply has no basis in the claim language or the intrinsic patent documents. As described in the specification of the '777 Patent, it is not the "shorthand designation" or "shorthand representation" itself that selects a larger set of information; rather, the computer ("PC 10") that does the selecting of the larger set of information, based on the shorthand information input by a user.

Additionally, as to the '214 Patent, PSI seeks to construe "shorthand information" as "abbreviated representations of a desired destination address or other address book information." First, it is curious that PSI asserts a construction of this term for the '214 Patent that is different from PSI's construction of the term for the '777 Patent, particularly given that the '214 Patent is directly related to the '777 Patent and indeed shares identically the relevant portions of the specification that describe shorthand information. (Ex. 6 ['777 Patent], col. 3:63-65, col. 16:20-32; Ex. 7 ['214 Patent], col. 4:10-12, col. 18:24-35) It is well established that the same term recited in the claims of two related patents should be construed consistently in both, *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003); accordingly, PSI's proposed construction is erroneous. Moreover, one of skill in the art would understood the term as proposed by Stamps.com, not by PSI, (McDaniel Decl. ¶ 27), and the specification of the '214 patent does not require such a limited definition. (Ex. 7, ['214 Patent], col 4:10-12,

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

1  col. 18:24-35)   Shorthand information in the '777 Patent and the '214 Patent

2  should therefore be construed consistently, as **"information that identifies a**

3  **larger set of information."**

4  **H.    Postal Indicia ('808 Patent, claims 32, 39)**

5      The term "postal indicia" appears in claims 30 (from which asserted claim

6  32 depends) and 36 (from which asserted claim 39 depends) of the '808 Patent.

7  Consistent with the description in the '808 Patent, and indeed the very purpose of

8  the invention of the '808 Patent, "postal indicia" should be construed to mean "**a**

9  **printed designation on mail that the Post Office can scan to verify that an item**

10  **of mail has been posted with authorized postage."**

11      The '808 Patent describes systems and methods for printing on an envelope

12  an indication that postage has been paid, such that that indication can be read by

13  the USPS's automated mail processing equipment.  (Ex. 9 ['808 Patent], col. 1:54-

14  58; col. 6:4-6)  As explained by the inventors of the '808 Patent, the printing of

15  such a "postal indicia" is complicated by the fact that the USPS's regulations

16  require that a postal indicia be printed within certain margins of an envelope in

17  order to be read by the USPS's automated mail processing equipment, and in

18  normal use, printers generally will not allow printing anything within those

19  margins.  (Ex. 9 ['808 Patent], col. 1:54-58; col. 2:55-62)

20      PSI's construction, on the other hand, improperly includes postage that is

21  "affixed" rather than printed, and fails to limit "postal indicia" to that which the

22  Post office can scan to verify that an item of mail has been posted with authorized

23  postage.  The only "postal indicia" discussed in the '808 Patent is printed, not

24  affixed, and can be scanned by the Post Office; indeed printing a postage indicia on

25  a piece of mail so that it can be processed by the Post Office is the very purpose of

26  the invention described in the '808 Patent.  This feature of the invention of the

27  '808 patent was made clear at the outset of the '808 Patent, which explains that

28  "postage indicia must be printed in a prescribed manner to permit the mail

20

1  handling and optical reading equipment to properly interpret the PC postage and

2  addressee information." (Ex. 9 ['808 Patent], col. 1:54-58). Similarly, as the

3  patentee explains, "[a]n exemplary embodiment of the present invention enables

4  postage systems to print indicia-based postage within the constraints established by

5  the USPS." (Ex. 9 ['808 Patent], col. 6:4-6)

6        Indeed, the '808 Patent actually teaches away from PSI's construction that

7  would construe "postal indicia" to include marks that are *affixed* to an envelope as

8  opposed to *printed* on an envelope. The necessity of printing labels and then

9  affixing those labels to envelopes, rather than printing directly to an envelope

10  within the tolerances set forth by the USPS, was one of the problems of the prior

11  art that the invention of the '808 Patent was meant to solve. (Ex. 9 ['808 Patent],

12  col. 2:55-62) Further, the inventors mention "printing postal indicia onto

13  envelopes" numerous times when describing their invention. (Ex. 9 ['808 Patent],

14  col. 3:6, 17-18) Therefore, it would be improper to construe "postal indicia"

15  broader than what is contemplated by the patents – in other words, as anything

16  other than a postal authorization that is **printed** and that **the Post Office can scan**.

17  *Phillips*, 415 F.3d at 1315; *Wang Labs*, 197 F.3d at 1382-83.

18  **I.    Means-Plus-Function Limitations**

19        Several of the limitations in the asserted claims of the patents-in-suit are

20  written in means-plus-function format. In the accompanying Exhibit 1,

21  Stamps.com sets forth the function and corresponding structure of each of those

22  limitations as the Federal Circuit instructed in *Sage Products*, 126 F.3d at 1428.

23        Stamps.com and PSI's expert generally agree regarding the functions recited

24  in the means plus function limitations. However, PSI's expert contends that for

25  several of these limitations, the specifications of the patents fail to disclose any

26  corresponding structure. This is simply false. As the Federal Circuit has

27  explained, the "structure" corresponding to a function that is executed on a

28  computer or other processor-based system is typically the computer programmed

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

to execute an algorithm disclosed in the specification. *See WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). An "algorithm" may be set forth in a variety of ways, such as in a flow chart or an explanation of steps that may be performed in the text of the specification. *In re Freeman*, 573 F.2d 1237, 1245-46 (CCPA 1978). In addition, as always with claim construction, the description of corresponding structure is reviewed through the eyes of one of skill in the art. *See Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1378-1380 (Fed. Cir. 1999) (reversing district court's finding of indefiniteness of means-plus-function limitation because the district court failed to consider the specification in light of the knowledge of one skilled in the art). Thus, a description in the specification that may appear cursory to the layperson may suffice to inform the skilled artisan as to the structure used to implement the recited function. *Id*; *WMS Gaming,* (identifying the structure of the "means for randomly selecting one of said plurality of assigned numbers" to be "random number selectors").

For example, PSI's expert contends that "means for formatting data to be sent to a printer coupled to said system, . . ." in claim 1 of the '597 Patent is unsupported by corresponding structure. However, the specification expressly discusses a means for formatting the data: the client computer, programmed to encode the postage data into a bar code format such as PDF417. (Ex. 2 ['597 Patent]; Figs. 16A, 16B; col. 12:9-17; col. 16:35-48) The disclosure of the corresponding structure could not possibly be more clear; indeed, a specific exemplary format is disclosed.

Similarly, PSI's expert contends that "means, executing at least in part on the second subsystem, for transferring a predetermined amount of said representative value from the portable processor via the communication link to said second subsystem" in claim 1 of the '991 Patent is unsupported by the specification. This is incorrect. As is clear from the preamble and the first

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

1    limitation of the claim, the "second subsystem" is a client computer that has

2    requested postage from the portable processor, and the communication link is the

3    link between the client computer and the first subsystem, i.e., a server to which the

4    portable processor is coupled.  The specification discloses the E-STAMP CLIENT

5    module that is used to create the postage request at the client (the "second

6    subsystem"), and the network interface card at the client computer that is used to

7    transmit the postage request over the network.  (Ex. 3 ['991 Patent], col. 7:14-20;

8    col. 8:60-67; col. 9:1-9; col. 11:33-44, Figs. 1C, 6 (650)).  The "means . . . for

9    queuing requests from other ones of the affiliated subsystems, . . ." is also

10   supported by the patent disclosure, which specifically explains that the E-STAMP

11   SERVER module running on the server "provides control for such functions as

12   queuing and serving postage requests from a plurality of client systems."  (Ex. 3

13   ['991 Patent], col. 7:27-31, 9:38-41)

14        PSI's expert also contends that the limitation of claim 34 of the '980 Patent

15   that recites "means for interfacing with a document generation program . . ." is

16   unsupported.  As above, this assertion is itself unsupported.  The specification of

17   the '980 Patent discloses that the client computer is programmed to execute an

18   interface program that coordinates a document generation program (such as, for

19   example, a card generating program) and a postage generation program (such as

20   the E-STAMP program), and facilitates the communication of data between the

21   document generation program and postage generation program.  (Ex. 4 ['980

22   Patent], col. 16:16-26)

23        PSI's expert also contends that several different limitations of the '777

24   Patent lack any supporting disclosure.  As usual, this is incorrect.  For example, the

25   "means for accepting a demand for a selected amount of value . . ." recited in claim

26   1 of the '777 Patent is clearly set forth in the specification, which discloses that the

27   server running the Metering Program accepts demands for postage, including the

28   step of decrypting the demand utilizing a decryption key available on the server

---

23

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

1    where encryption of the demand is used.  (Ex. 6 ['777 Patent], Fig. 3 (303); col.

2    14:47-51, 53-55).  Similarly, the specification discloses structure corresponding to

3    a "means for automatically deducting said selected amount of value from one or

4    more of said value credits:" the server running the Metering Program, the memory

5    devices on which the customer postage credits are stored, and the programming

6    that causes it to first determine whether proper funding is available for the

7    transaction, and then deduct the postage from the customer's account.  (Ex. 6 ['777

8    Patent], Figs 1A, 3 (306); col. 7:6-8 (PC 10), 17-19 (portable memory 15,

9    receiving device 14), 20-26 (disk drive 13), col. 15:25-39; col. 16:55-59).

10        According to PSI's expert, the "means for summarily indicating a desired

11   piece of information . . ." recited in claim 55 also lacks support, despite the fact

12   that the specification expressly identifies the structure: a client computer that

13   provides a shorthand designation of desired information, such as a destination

14   address, printing format, or information involved in creating the postal indicia.

15   (Ex. 6 ['777 Patent], Fig. 2 (204); col. 9:33-53)  Similarly, the "means for creating

16   a demand for said desired amount of value, . . ." is also purportedly unsupported,

17   despite the fact that the specification discloses that the Demand program

18   "assembles predetermined portions of this information into a demand which is of a

19   format suitable for communication to, and acceptance by, a remote metering device

20   (step 210)."  (Ex. 6 ['777 Patent], col. 11:21-25)  The information referenced in the

21   specification is the information entered by the customer to define the postage

22   demand, which is set forth at Figure 2, steps 203-209.  In addition, the creation step

23   "includes the use of an encryption process to encrypt the demand which is to be

24   sent via PSN 103."  (Ex.6 ['777 Patent], col. 12:6-8)

25        PSI's expert also contends that the "means for controlling the transmission

26   of said demand from said first system to said remote system over said public

27   network" is unsupported by the specification.  This, too, is incorrect.  The "remote

28   system" is the second processor-based system recited in the preamble to the claim.

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

The specification explains that "the Demand program establishes a link between PCs 20 [the client, running the Demand program] and 10 [the server, running the Metering program] (step 211)." The patent states that the link is any link suitable for data communication between the two computers, such as PSN 103 disclosed in Figure 1, and recites several optional substeps in the preferred embodiment. (Ex. 6 ['777 Patent], Figs. 1, 2 (211); col. 12:15-26) This is more than sufficient. Similarly, PSI's expert asserts that the "means for automatically deducting at least a portion of said predetermined amount of value from at least one of said value credits" is unsupported by any disclosure of structure. As shown above, this assertion is specious. (Ex. 6 ['777 Patent], Figs 1A, 3 (306); col. 7:6-8 (PC 10), 17-19 (portable memory 15, receiving device 14), 20-26 (disk drive 13), col. 15:25-39; col. 16:55-59).

Finally, PSI's expert contends that the "means for creating a data packet comprising data formatted as a function of a received demand" lacks any corresponding disclosure in the specification. The specification, however, recites at great length the process by which a data packet is created and the information that it contains, including the information contained in the packet, the optional use of encryption, the fact that the packet may consist of digital information used to construct a postage indicia at the client (as opposed to a digital representation or image of an indicia). (Ex. 6, Fig. 3 (307); col. 17:12-60) This disclosure is more than sufficient to apprise one of skill in the art as to the corresponding structure.

## V. <u>CONCLUSION</u>

For the reasons set forth above, this Court should adopt the constructions proposed by Stamps.com.

Dated: November 24, 2008      Respectfully Submitted,

/s/ Philip J. Graves
Philip J. Graves
GRAVES LAW OFFICE, P.C.
Attorneys for Plaintiff and Counterdefendant
STAMPS.COM INC.

**STAMPS.COM INC.'S OPENING CLAIM CONSTRUCTION BRIEF**