Philip J. Graves (SBN 153441)
*pgraves@graveslawpc.com*
John R. Walton (SBN 130666)
*jwalton@graveslawpc.com*
Pablo D. Arredondo (SBN 241142)
*parredondo@graveslawpc.com*
Marjorie A. Witter (SBN 250061)
*mwitter@graveslawpc.com*
Fredricka Ung (SBN 253794)
*fung@graveslawpc.com*
GRAVES LAW OFFICE, P.C.
12121 Wilshire Blvd., Suite 775
Los Angeles, California 90025
Telephone:  (310) 295-6500
Facsimile:  (310) 295-6501

Attorneys for Plaintiff-Counterdefendant
STAMPS.COM INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| STAMPS.COM INC., | No. CV 06-7499 ODW (CTx) |
| Plaintiff, | **DECLARATION OF PATRICK McDANIEL IN SUPPORT OF STAMPS.COM'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE INVALIDITY** |
| v. | |
| ENDICIA, INC. and PSI SYSTEMS, INC., | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS. | |

1

I, Patrick McDaniel, declare as follows:

1.     I have been engaged by Stamps.com Inc. ("Stamps.com") as a technical consultant in the case entitled <u>Stamps.com Inc. v. Endicia, Inc., et al.</u>, Case No. CV 06-7499 ODW (CTx).  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently thereto.

2.     I am an Associate Professor in the Computer Science and Engineering Department of Pennsylvania State University in State College, Pennsylvania.  I perform research related to and teach courses in general computer science and computer and network security.  I have held this position since the fall of 2004.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently thereto.

3.     I have substantial expertise in the field of secure systems design and applied cryptography.  Secure systems design is directed to the design and implementation of systems that, among other things, support the authenticity, integrity and confidentiality of data.  Applied cryptography is the application of cryptographic algorithms to achieve those goals.  I will refer to both of these fields together, for the remainder of my declaration, as secure systems design.  A true and correct copy of my current resume is attached hereto as Exhibit 1.

4.     My education and professional endeavors have focused on the field of secure systems design.  I graduated from Ohio University with a B.S. in Computer Science in 1989.  I subsequently attended Ball State University, where I obtained an M.S. in Computer Science in 1991.  I worked as a software developer and project manager at a variety of software and computer hardware development companies during 1991 to 1995, and in 1996 joined the University of Michigan where I researched Java security technologies as part of a project that was funded by the National Security Agency.  In 1997 I received a Kennedy Space Center Fellowship from NASA and as part of the duties of that fellowship I worked with NASA for three

1   years, creating a Java security framework used during space shuttle launches, and

2   served as a security consultant for other projects developed within NASA's Kennedy

3   Space Center and Ames Research Center.

4        5.    During 2000 to 2001, I was the technical lead on a DARPA-funded

5   project within the Dynamic Coalitions program focused on enforcing security policies

6   in multi-party communication systems.  In addition, during this period I developed the

7   Antigone platform, a large-scale secure multi-party communication system.

8        6.    After receiving a Ph.D in Computer Science and Engineering from the

9   University of Michigan in late 2001, I joined AT&T Labs as a Senior Research Staff

10  Member.  At AT&T, I redesigned AT&T's central authentication service for all of its

11  internal websites and consulted closely with the security architects of AT&T's major

12  network services on projects involving security management, network security,

13  multiparty communications, and other security functionalities until August 2004,

14  when I joined the faculty of Pennsylvania State University.

15       7.    I am the Editor-in-Chief of the ACM Journal Transactions on Internet

16  Technology, one of the most influential journals in the field of secure systems design.

17  I am also an Associate Editor of the Journals of ACM Transactions on Information

18  and Systems Security, IEEE Transactions on Software Engineering, and IEEE

19  Transactions on Computers.  I have served on the Advisory Board of the

20  Encyclopedia of Cryptography and Security.  I have served as Chair, Vice-Chair or as

21  a member of numerous conference communities devoted to various aspects of secure

22  systems design.  I have given numerous invited talks on various subjects related to

23  secure systems design, and have authored or co-authored numerous publications in

24  that field.

25       8.    I have analyzed all patents and claims in suit, including Claims 7, 42, and

26  76 of the '991 Patent, and Claims 3, 50, and 63 of the '777 Patent and Claims 13, 50,

27  and 89 of the '214 Patent.

28

9.     I have analyzed the prior art cited by PSI in its Motion for Summary Judgment Re: Invalidity.

10.     I have considered the testimony of Dr. Tygar, retained expert for PSI and co-author of the technical report, CMU-CS-93-107 ("CMU-107"), that Dr. Tygar opines invalidates the '991 and the '777 Patents.

11.     I have considered the testimony, and documents, of Dr. Harry Whitehouse, principal for PSI, and named inventor of the Whitehouse '562 Patent that Dr. Tygar opines invalidates the '991 Patent when combined with  CMU-107.

12.     In reaching an opinion as to the validity of the asserted claims I have considered the scope and content of the prior art, the differences between the art and the claims at issue, the level of ordinary skill in the art, and other objective evidence relevant to whether a person of skill in the art would have considered the inventions obvious at the time the patent applications were filed.

## I.     PRIOR ART

**A.     Claims 7, 42 and 76 of the '991 Patent**

13.     PSI contends that a document entitled "Cryptography: It's Not Just For *Electronic* Mail Anymore", co-authored by J.D. Tygar and Bennet Yee ("Tygar-Yee"), and U.S. Patent No. 5,319,562 ("Whitehouse '562") each disclose every element of claims 7, 42 and 76 of the '991 Patent, that Tygar-Yee renders each of these claims obvious by itself and in light of Whitehouse '562.  I disagree.

14.     Claims 7 and 42 of the '991 Patent, including claims 1 and 40 from which they depend, recite a centralized networked system for distributing value (such as postage) wherein a user is completely free of *any* type of local postage meter.

15.     Tygar-Yee does not disclose a system for transferring a predetermined amount of postage value (or any type of representative value) via a network in response to a request for value to be printed, and then printing an indicia incorporating the predetermined amount of value.  Tygar-Yee merely explores, on a general level, the concerns inherent in a postage distribution system. Tygar-Yee provides no specific

3

1  detail, nor discloses any system, as to how a person having ordinary skill in the art

2  would address these inherent concerns.

3        16.    While Dr. Tygar asserts that Tygar-Yee teaches a system of distributing

4  postage value over a network of computers, (Tygar Decl. ¶¶ 226-27, 250) the portions

5  of the article to which he points do not support this statement.  Dr. Tygar asserts that

6  the quoted language indicates that a "given secure coprocessor, therefore, can

7  distribute value bearing electronic stamps to multiple users on the network."  This is

8  incorrect.

9        17.    Dr. Tygar's quote appears selectively doctored to support an inaccurate

10  inference as to what it teaches.  Indeed, in at least one instance Dr. Tygar inserts text

11  in brackets – "[via the local network]" (Tygar Decl. ¶ 254) – that are not found at all

12  in Tygar-Yee, in order to suggest the very thing that is missing from the reference.

13        18.    The quote, in full and in context, reads:  "The equipment required for our

14  electronic postage meter is a secure coprocessor, a PC (which serves as the host for

15  the coprocessor), a laser printer, a modem, and optionally an optical character

16  recognition (OCR) scanner and/or a network interface.  Like ordinary postage meters,

17  our PC-based postage meter operates in an office environment where the postage

18  meter is a shared resource, much as laser printers are today."  (Ex. 3, p. 11)  (emphasis

19  added)

20        19.    The next paragraph reads as follows:  "The basic idea is simple: we

21  obtain the destination and return addresses and weight/delivery class from the user -

22  directly from the word processor running on the user's own PC via the local network,

23  by using OCR software and reading directly from the envelope, or by direct user input

24  at the keyboard - and request a cryptographic stamp from the secure coprocessor.  The

25  secure coprocessor lowers the credit value inside it, and generates a cryptographically

26  signed message containing the value of the stamp, all of the addressing information,

27  the date, the ID of the secure coprocessor, and other serial numbers.  This message (a

28  bit vector) is sent to the PC, which encodes it in a machine readable manner and prints

1    it on the laser printer to be affixed to an envelope or package." (Ex. 3, pp. 11-12)

2    (emphasis added)

3         20.    Taken in context, it is clear to the person of ordinary skill in the art that

4    this does <u>not</u> describe a system in which value bearing electronic stamps are

5    distributed from a coprocessor to multiple users on a network. Instead, the

6    combination of a coprocessor storing postage value and a computer to which it is

7    directly coupled is treated like an ordinary postage meter – i.e., the user of the

8    computer requests postage from the coprocessor that is directly coupled to the

9    computer, and postage prints out from an attached printer. The network interface is

10   used as a means of obtaining address and weight/delivery class data, not as a means of

11   networking the computer to enable the coprocessor to receive and respond to remote

12   requests for postage. This is further indicated by the fact that the network interface

13   and OCR scanner are both expressly stated to be <u>optional</u> components, which would

14   not be the case if Tygar-Yee taught a system for receiving and responding to remote

15   requests for postage in a networked environment.

16        21.    Tygar-Yee does state that the message containing the value of the stamp

17   is "sent to the PC." However, one of skill in the art would know that this refers to

18   sending the message from the coprocessor to the PC, to which the coprocessor is

19   directly coupled.

20        22.    The quoted text also states: "<u>Like ordinary postage meters</u>, our PC-based

21   postage meter operates in an office environment where the postage meter is a shared

22   resource, <u>much as laser printers are</u> today." (Ex. 3, p. 11) (emphasis added) This text

23   does not suggest a networked solution such as is recited in the claims of the '991

24   and '777 Patents, in which the meter would transfer postage to remote computers in

25   response to a demand. Rather, it suggests that the PC-based postage meter will

26   operate as a resource that various people will share in a manner similar to a postage

27   meter (which people use by direct physical contact) or a laser printer (to which people

28   may send documents to be printed).

23.    This is further reinforced by the text at the top of page 10: "Because secure coprocessors <u>need to handle only a handful of users</u> (<u>workstations or PCs are typically single user machines</u>) and the users are unlikely to require many concurrent transactions, <u>large amounts of stable storage should not be needed</u> . . . ." (Ex. 3, p. 10)

24.    This language makes it crystal clear that each of the coprocessors is only intended to serve a single workstation or PC, to which it is directly coupled.

25.    Dr. Tygar also points to section 5.2, at pages 12-13, of Tygar-Yee, to support his contention that the document teaches a system programmed to distribute postage value over a network. However, this section of the article simply states that the electronic postage meter may update its store of postage credit by requesting postage value via modem. This operation is fundamentally different from the distribution of predetermined amounts of postage value that are to be printed in the predetermined amount. The first adds postage value to a processor; the latter drains it.

26.    The secure co-processors of Tygar-Yee must be physically transported from one location to another to enable one to access the value stored therein.

27.    Tygar-Yee suggests a direction that is fundamentally counter to the approach taken in the '991 Patent and the '777 Patent – an approach that required a user to carry around a physical hardware device that stored the postage, rather than the networked client/server approach recited in claims 7 and 42 of the '991 Patent.

28.    The "means . . . for transferring" limitation of claim 1 of the '991 Patent encompasses a portion of the algorithm for entering postage request parameters disclosed at Figure 7 and in the text of the '991 Patent.

29.    Claim 40 of the '991 Patent (from which claim 42 depends) recites, inter alia, a "method for transferring a pecuniary value from a portable memory device coupled to a first general purpose processor-based system to a second general purpose processor-based system via a communication link," and "obtaining, by said second processor-based system, via said communication link said pecuniary value from said portable memory."

6

30.     Tygar-Yee does not disclose entry of postage transaction parameters as recited in Figure 7 and the associated text of the '991 Patent.  In addition, Tygar-Yee does not disclose any means or method for transferring a predetermined amount of representative or pecuniary value to a user's computer system via a communication link from a portable processor coupled to a remote computer system, and printing an indicia having the predetermined amount of value.

31.     Although Dr. Tygar opines that Tygar-Yee teaches a system programmed to distribute postage value over a network of computers, (Tygar Decl. ¶ 234), the only basis that he cites is the text quoted above.  As shown above, this text does not suggest such an architecture.

32.     This is not surprising given that Tygar-Yee teaches a direction that is fundamentally counter to the approach taken in the '991 Patent and the '777 Patent – an approach that required a user to carry around a physical hardware device that stored the postage, rather than the networked client/server approach recited in the claims of the '991 Patent.

33.     In fact, Tygar-Yee expressly teaches that the centralized system for distributing postage value recited in claims 7 and 42 of the '991 Patent and claims 3, 50 and 63 of the '777 Patent is disadvantageous and has "no real advantages" over the use of a secure memory coupled directly to a user's computer.  At pages 10-11, Tygar-Yee states:  "With the bank rendezvous model, the 'bank' supervises the transfer of funds.  While it is easy to enforce the access controls on account data, this suffers from problems with non-scalability, loss of anonymity, and a very real risk of denial of service from excessive centralization:  Because every transaction must contact the bank server, access to the bank service will be a performance bottleneck.  The system does not scale well to a large user base – when the bank system must move from running on a single computer to a several machines [sic], distributed transaction systems techniques must be brought to bear anyway, so this model has no real

7

advantages over the use of secure coprocessors in ease of implementation."  (Ex. 3, pp. 10-11) (emphasis added)

34.     This paragraph expressly teaches the skilled artisan away from the basic architectural choice embodied in the claims of the '991 and '777 Patents.  It strongly indicates that those of skill in the art would not have considered the inventions recited in these claims obvious as of the priority dates of those patents.

35.     Similarly, on page 2, in discussing what the authors considered to be problems with a system using digitally signed postage, Tygar-Yee stated that "[t]he protection scheme may depend on a highly available network connecting post office facilities in a large distributed database.  Since 39,985 autonomous post office facilities exist, such a network would suffer from frequent failures and partitions."  (Ex. 3, p. 2) (emphasis added)

36.     This belief that a network with less than 40,000 nodes would suffer from frequent failures and partitions was an outgrowth of the state and development of computer networks at the time the article was written in the early 1990's.  At that time, and in particular prior to the widespread proliferation of the Internet in the mid to late 1990's, computer networks were typically linked by dial-up modem, and were highly unreliable.  Accordingly, it was natural for those skilled in the field of secure systems design to consider a solution involving the use of portable processors directly coupled to a user's computer to be superior to a networked solution for the problems addressed in Tygar-Yee, or in the '991 and '777 Patents.

37.     Claim 7 of the '991 Patent also recites "means. . . for queuing requests" for predetermined amounts of value communicated via a communication link.

38.     Claim 42 recites "queuing information communication between said first system and a plurality of processor-based systems, the information communication comprising requests by ones of the plurality of systems for pecuniary value from said portable memory."

39.     Tygar-Yee does not disclose queuing requests for postage or any other type of representative value.

40.     Dr. Tygar asserts that Tygar-Yee discloses queuing.  (Tygar Decl. ¶¶ 240, 262)  This is not correct, because there is absolutely no description or even a bare reference to queuing anywhere in Tygar-Yee.  Thus, Dr. Tygar's statement that Tygar-Yee contains as much description of queuing as does the specification of the '991 Patent is also incorrect.

41.     Dr. Tygar also states that Tygar-Yee discloses queuing on the ground that it "explain[s] that the secure coprocessors will be able to handle concurrent transactions."  However, the text actually states that "users are unlikely to require many concurrent transactions . . . ."  (Ex. 3, p. 10)  Within the context of the entire sentence, which points out that workstations and PCs are typically single user machines, this vague suggestion is insufficient to alert the skilled artisan that the use of a queue for postage requests would even be useful with the system proposed in Tygar-Yee.  This is particularly true since there is simply no need for a queue in a single user computer.

42.     Dr. Tygar does not offer any substantive analysis as to how Tygar-Yee could possibly disclose the element of queuing.  Rather, Dr. Tygar points only to a misrepresentation of my expert report on infringement.  (Tygar Decl. ¶ 241)  Specifically, Dr. Tygar points to language that applies to a different element, that of printing.  The language in my report cited by Dr. Tygar does not mention queuing.

43.     Whitehouse '562 teaches a system where each and every user is required to possess a "dongle," i.e., a hardware device that connects to the user's computer through a "parallel port," on which postage value is stored.  This is a critical and fundamental difference between the system recited in claims 7 and 42 of the '991 Patent, and the system in Whitehouse '562.

44.     Whitehouse '562 does not disclose or suggest to the person having ordinary skill in the field of secure systems design that postage requests should be

9

1  queued.  Queuing of requests from a single user would never be required for the

2  functioning of the system taught in Whitehouse '562.

3      45.      In fact, Whitehouse '562 teaches away from the use of queuing in a

4  system such as claimed in the '991 Patent.  In teaching that postage value should be

5  stored in a dongle that is directly coupled to a user's computer, Whitehouse taught an

6  architecture that would have no need of any means of queuing or simultaneously

7  servicing requests for postage, as only one request would be expected to be received at

8  a time.

9      46.      Tygar-Yee's teaching of the infeasibility and lack of any advantages of

10  the networked solution for postage distribution is also reflected in Whitehouse '562,

11  which teaches a nearly identical architecture to that taught by Tygar-Yee.

12      47.      In U.S. Patent No. 6,005,945, ("Whitehouse '945"), a patent which

13  issued to Whitehouse in December of 1999, Whitehouse '562 is described.

14  Whitehouse '945 notes that the Whitehouse '562 patent requires 'local user-based

15  system' to serves 'as a repository for unused (i.e. available) postage" and to "manage

16  the dispensing of that postage on a piece by piece basis."  Whitehouse '945 goes on to

17  note that the system of Whitehouse '562 "brings with it the requirement for stringent

18  and costly security measures at *each* user's site". (emphasis added).

19      48.      The "stringent and costly security measures at each user's site" are

20  obviated under the architecture of the '991 Patent.  This is a critical difference

21  between the invention recited in claims 7 and 42 of the '991 Patent and the device

22  disclosed in Whitehouse '562.

23      49.      For at least these reasons, it is my opinion that neither Tygar-Yee nor

24  Whitehouse '562 discloses every limitation of claims 7, 42, or 76 of the '991 Patent,

25  and that neither of these references renders these claims obvious, either separately or

26  when considered together.

27      50.      Claim 76 of the '991 Patent recites, among other things, coupling a

28  refreshable memory device for storing monetary equivalent value to a first system,

1   which is coupled to a plurality of associated systems forming a network.  The claim

2   also recites transferring a predetermined amount of monetary equivalent value from a

3   second system to the memory device via a communication link, the amount of

4   monetary equivalent value being passed blindly by the first system to the memory

5   device.

6       51.    Neither Tygar-Yee nor Whitehouse '562 discloses the coupling of many

7   processors to a first processor to which a refreshable memory is not coupled, nor do

8   they teach the blind passing of data between the processors, either singly or in

9   combination.  Neither of these references discloses every limitation of claim 76, nor

10  do they render the claim obvious either singly or in combination.  Tygar suggests that

11  the mere use of encryption is sufficient to meet the "passed blindly."  (Tygar Decl.

12  ¶ 285)  This is not true.  The mere use of encryption does not say anything about how

13  data is passed.  Tygar further suggests that Whitehouse '562 also discloses "passed

14  blindly" as discussed in the '991 Patent.  (Tygar Decl. ¶ 286)  This also is false.

15  Whitehouse '562 teaches that the PC should receive value from the U.S. Postal

16  Service, after which it should encrypt that value before it is written to the hard drive.

17  Therefore, the PC is not "passing blindly," but actually manipulating the data directly.

18  **B.**    **Claims 3, 50 and 63 of the '777 Patent**

19      52.    PSI contends that Tygar-Yee and U.S. Patent No. 6,233,565

20  ("Lewis '565") each disclose every element of claims 3, 50 and 63 of the '777 Patent,

21  that Tygar-Yee renders each of these claims obvious by itself and in light of

22  Lewis '565.  I disagree.

23      53.    As an initial matter, Tygar-Yee does not disclose or even suggest a

24  system in which postage value is distributed by a processor-based system in response

25  to purchase demands from other processor-based systems, for the reasons set forth

26  above.  Dr. Tygar's statements to the contrary in connection with the preambles of

27  claims 3, 50 and 63 (Tygar Decl. ¶¶ 298, 329, 364) are based on the same portions of

28  Tygar-Yee that are discussed above, and are incorrect, for the reasons set forth above.

11

54.     Dr. Tygar states that Tygar-Yee discloses a "means for accepting a demand for a selected amount of value from a particular one of said plurality of processor systems via a data communication between said apparatus and said particular one of said processor systems, wherein said apparatus is adapted to substantially simultaneously accept demands from processor systems of said plurality in addition to said particular one of said processor systems," as that term is used in claim 3 of the '777 Patent.  This is incorrect.

55.     First, Dr. Tygar states that Tygar-Yee includes as much description of corresponding structure as does the '777 Patent.  This is simply false.  The corresponding structure in the '777 Patent for this element includes a flow diagram and several parts of the written description.  I describe this structure more thoroughly at ¶¶ 131-137 below.  Tygar-Yee has no such disclosure, and the portions of Tygar-Yee to which Dr. Tygar points (Tygar Decl. ¶ 302) fail for this purpose for the same reasons set forth above.

56.     Dr. Tygar similarly states that this portion of Tygar-Yee is also sufficient to disclose the first limitation of claim 50, which reads: "accepting a demand for a predetermined amount of postage from a particular one of said plurality of processor systems via a data communication link between said remote system and said particular one of said processor systems, wherein said remote system is adapted to substantially simultaneously accept demands from processor systems of said plurality in addition to said particular one of said processor systems."

57.     Dr. Tygar's assertion that this limitation is disclosed in Tygar-Yee fails for the same reason as set forth above, i.e., there is simply no disclosure in Tygar-Yee of a system in which demands for predetermined amounts of postage are accepted from particular ones of a plurality of processor systems.  The system in Tygar does not accept demands from other systems; each coprocessor services only postage demands emanating from a single source: the PC or workstation to which it is attached.

58.     Dr. Tygar next suggests (but does not actually state) that Tygar-Yee discloses a system that substantially simultaneously accepts postage demands from remote processor systems.  (Tygar Decl. ¶¶ 303, 333)  This is incorrect.  Tygar-Yee does not disclose a system adapted to substantially simultaneously accept requests for postage from multiple separate remote processor systems, as recited in claims 1 and 43 (from which claims 3 and 50 depend).  In fact, Tygar-Yee teaches away from such a system, because it does not accept requests for postage from remote systems at all.  The portions of Tygar-Yee to which Dr. Tygar cites for this point do not support his contention, for the reasons set forth above in connection with queuing.

59.     Dr. Tygar also states that Tygar-Yee discloses a plurality of portable memories coupled to the apparatus.  (Tygar Decl. ¶ 309)  However, Tygar-Yee does not disclose a plurality of portable memories coupled to any workstation or PC (the "apparatus" at issue in Tygar-Yee).  None of the sections of the document to which Dr. Tygar cites contain any such disclosure.  This is not surprising, given the statement in the document that "large amounts of stable storage should not be needed" due to the fact that the "coprocessors need to handle only a handful of users . . . ."  (Ex. 3, p. 10)

60.     Dr. Tygar also states that Tygar-Yee discloses a "means for transmitting a data packet corresponding to said selected amount of value to said one of said plurality of processor systems . . . ."  This is incorrect.  The corresponding structure in the '777 Patent for this element includes several lines of written description.  *See, e.g.*, '777 Patent, 1:22-33.  Tygar-Yee has no such disclosure, and the portions of Tygar-Yee to which Dr. Tygar points (Tygar Decl. ¶ 320) fail for this purpose for the same reasons set forth above.

61.     Similarly, Dr. Tygar asserts that Tygar-Yee discloses "transmitting a data packet corresponding to said predetermined amount of postage to said one of said plurality of processor systems."  (Tygar Decl. ¶ 341)  Tygar-Yee has no such disclosure, and the portions of Tygar-Yee to which Dr. Tygar points (Tygar Decl. ¶ 320) fail for this purpose for the same reasons set forth above.  Dr. Tygar's reference

13

1    to the "sending to the PC" and meter recharging disclosures in Tygar-Yee simply do

2    not disclose transmitting a data packet corresponding to a predetermined amount of

3    requested postage to a remote requesting system.

4          62.    Dr. Tygar also states that Tygar-Yee discloses the use of shorthand or

5    address information in a system like that recited in claims 43 (from which claim 50

6    depends) and 63 of the '777 Patent.  (Tygar Decl. ¶¶ 336-37, 375)  However, the

7    portions of Tygar-Yee to which he cites do not contain any disclosure of the use of

8    shorthand information (such as an account ID).  Although Dr. Tygar asserts that

9    Tygar-Yee contains as much description of corresponding structure as does the '777

10   Patent, this is false – as I explain in more detail below, the '777 Patent contains

11   several passages, amounting to well over half a column of text, concerning shorthand

12   information.  Moreover, it seems unlikely that shorthand information would be

13   necessary or even useful in the architecture described by Tygar-Yee, in which a

14   coprocessor is directly coupled to a particular workstation or PC.  Thus, the notion of

15   locating complete account records using shorthand information would not have been

16   obvious to a person of skill in the art as applied to the system described in Tygar-Yee,

17   as of 1997 or 1998.

18         63.    Tygar-Yee also does not disclose the use of multiple portable memories

19   coupled to a computer system to store postage value, as recited in claim 3.  In fact, in

20   the architecture disclosed in Tygar-Yee, only one memory storing postage value is

21   attached to a user's computer.  The technical challenges involved in dealing with the

22   multiplexing of customer account information across multiple memory devices, as

23   required by claim 3 of the '777 Patent, were not faced by Tygar-Yee.  For example,

24   identifying and routing requests to portable memories that contained a specific user's

25   account information is nontrivial.  Moreover, securing the requests and the customer

26   account information within this architecture was not contemplated by Tygar-Yee.  The

27   scalability concerns addressed in the '777 Patent were not trivial during 1996-98.

28

64.    Tygar-Yee, alone or in combination with the other references cited by PSI, did not teach or render the inventions recited in claims 3, 50 or 63 of the '777 Patent obvious to a person or ordinary skill in the art as of or prior to July 1998.

65.    The claims recited in the '777 Patent reflect Martin Pagel and Salim Kara's solution for dealing with the scalability concerns that arose from the approach disclosed in the earlier '991 Patent.

66.    U.S. Patent No. 6,233,565 ("Lewis '565") does not disclose the use of a plurality of portable memories, as required by claim 3.  Instead, Lewis '565 proposes that all account information be contained in a transaction database stored directly on a server.

67.    The technical challenges cited above involved dealing with the multiplexing of customer account information across multiple memory devices, as required by claim 3 of the '777 Patent, were not faced by Lewis and to overcome them required substantial experimentation and invention.

68.    Lewis '565 does not reference shorthand or address information in a demand for postage as identified in any of the claims or the specification.  For example, the absence of portable memories in Lewis '565 would lead to significantly different handling of shorthand information and address information within demands.

69.    Lewis '565, alone or in combination with the other references cited by PSI, did not teach or render the inventions recited in the claims of the '777 Patent obvious to a person of ordinary skill in the art as of either October 1996 or July 1998.

70.    For at least the foregoing reasons, neither Tygar-Yee nor Lewis '565 discloses every limitation of claims 3, 50 or 63 of the '777 Patent, and neither Tygar-Yee nor Lewis '565 renders these claims obvious, either separately or when considered together.

**C.** **Claim 17 of the '451 Patent**

  **1.** **"Printer offset"**

81.     Claim 17 of the '451 Patent recites a "means for querying one or more databases to determine a printer offset."

82.     The '451 Patent defines "printer offset" as the following:

"Printer offset or shift code is a variable dependent upon how an envelope is fed into a printer … Envelopes are fed into printers by means of feed trays …  However, the location of the feed tray and the way in which the envelopes are loaded may vary from printer to printer. Therefore, the printer offset variable may also vary from printer to printer."  (Ex. 37 ['451 Patent], 13:1-10)

"Printer offset" may be classified as top offset, center offset, or bottom offset.  (Ex. 37 ['451 Patent], 13:32-35)

83.     PSI argues that the following three software programs are each capable of querying one or more databases to determine a "printer offset":  (1) Microsoft Word for Windows 95 ("Word 95"); (2) DAZzle Designer 97 (version 3.0) and/or DAZzle User's Guide (version 2.5) ("DAZzle"); and (3) AddressMate for Windows v2.15 ("AddressMate").

84.     I have reviewed each of these three programs, and my opinions below are based on my review of these programs.

85.     For Word 95, PSI's expert cites the Windows Registry parameters "printMaxXExtent, printMaxYExtent, print MibXExtent [sic] and printMinYExtent" as examples of "printer offset."  (Soffer Decl. at Ex. E, pp. 1-3)  None of these parameters is a "printer offset" as defined in the '451 Patent.

86.     For DAZzle, PSI's expert cites the Windows Registry once again, but fails to point to any data that represents a "printer offset" as defined in the '451 Patent. (Soffer Decl. at Ex. E, p. 13)

87.    For AddressMate, PSI's expert cites the "vertical and horizontal offsets" stored in a template layout (TPL) file.  (Soffer Decl. at Ex. E, pp. 17-19)  However, these vertical and horizontal offsets are not a "printer offset" as defined in the '451 Patent.

88.    In summary, none of these three programs is capable of querying one or more databases to determine a "printer offset" as defined in the '451 Patent.  None of these programs discloses every limitation of claim 17 of the '457 Patent, nor do they render this claim obvious, either separately or when considered together.

**D.    Claims 32 and 39 of the '808 Patent**

**1.    "Postal indicia"**

89.    Claims 32 and 39 of the '808 Patent both specify printing a "postal indicia" onto an envelope.

90.    I understand that the Court has construed "postal indicia" to include at least (1) an amount of postage, <u>and</u> (2) a FIM barcode <u>or</u> a two-dimensional barcode. (Claim Construction Order, June 15, 2009, pp. 13-14)  An amount of postage is a postage with a dollar amount, not a permit or other indicia that does not indicate a dollar amount.  A FIM barcode must be printed no more than 1/8" from the edge of an envelope to be valid under U.S. Postal Service requirements.

91.    PSI argues that the following three software programs are each capable of printing a "postal indicia" onto an envelope:  (1) Word 95; (2) DAZzle; and (3) AddressMate.

92.    I have reviewed each of these three programs, and my opinions below are based on my review of these programs.

93.    None of these three programs is capable of printing a valid FIM. Consequently, none of these programs is capable of printing a "postal indicia" as construed by the Court.

94.    Claim 32 of the '808 Patent specifies a "means for mapping an image onto a virtualized sheet."  Claim 32 of the '808 Patent specifies "mapping an image onto a virtualized sheet."

95.    The structure corresponding to "means for mapping …" includes several pages of written description.  (Ex. 38 ['808 Patent], 13:44-15:45, 15:46-16:60, 16:61-18:60)

96.    None of these programs is capable of "mapping an image onto a virtualized sheet" as described in the '808 Patent.

97.    None of these programs discloses every limitation of claims 32 and 39 of the '808 Patent, nor do they render these claims obvious, either separately or when considered together.

## II.    DEFINITENESS

**A.    Claim 7 of the '597 Patent**

**1.    an interface program integrating said document generating program with said postage generating program**

101.    I have been informed that the Court has found that "interface program" is not a means-plus function claim term.

**2.    means for formatting data to be sent to a printer coupled to said system, wherein said formatted data is operable to print said correct amount of postage**

102.    Claim 7 of the '597 Patent recites "means for formatting data to be sent to a printer coupled to said system, wherein said formatted data is operable to print said correct amount of postage."

103.    A person of ordinary skill in the art would recognize the corresponding structure to include the following:

In addition, routines may be added to the E-STAMP program that will automatically convert information entered as the addressee's address into a PostNet Zip+4 bar code and/or automatically encode some of the

18

entered data regarding the postal storage device, the designation of the letter, etc. into a graphical security interface to be printed on a label or an envelope.  Furthermore, the E-STAMP program will be programmed to format all of the entered information to be printed in the desired format.

(Ex. 31 ['597 Patent], 12:9-17)

104.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

At step 922, the E-STAMP program may optionally be programmed to incorporate preselected information, entered into the E-STAMP program, into an encrypted message that is machine readable.  Any number of graphical security interfaces, such as Symbol's Portable Data File Code (the PDF417 symbology) as described above, may be used to encrypt the information.  An encrypted message may include any combination of the following information: the day, the date, the postage storage device serial number, the E-STAMP serial number, the sender's zip code, the addressee's zip code, the expiration date of the postage storage device, the cumulative values of the strike and dollar counters, PNM registration number, the user's identification number, and the Post Office identification number.

* * *

In step 923, the E-STAMP program utilizes the input/output ports of the card generating system to send to printer/label maker 19, the correct data pertaining to the meter stamp, the postage indicia, the encrypted message, the authorized amount of postage, the return address, the addressee's address, etc. to be printed on an envelope, as illustrated in FIG. 16B, or on detachable labels attached to the back of the greeting card as illustrated in FIG. 16A.

1  (Ex. 31 ['597 Patent], 16:35-17:1)  A person of ordinary skill in the art would

2  recognize the corresponding structure to also be reflected in the square bar codes

3  illustrated in Figures 16A and 16B.  (Ex. 31 ['597 Patent], Figs. 16A-16B)

4      105.   The number of programs or algorithms for formatting the type of data

5  described in this patent to be sent to a printer is relatively small, and these algorithms

6  are readily apparent to one of ordinary skill in the art.  Examples include PDF417,

7  Postscript and Printer Control Language (PCL).

8      106.   Column 16:35-48 describes the steps of formatting the entered

9  information into an encrypted message that is machine readable.  However, it is clear

10  from the specification that "encrypted" in this context does not refer to an encryption

11  process; rather it refers to a process of encoding information into a machine readable

12  format, e.g. a bar code.  For example, the specification specifically enumerates that

13  Symbol's Portable Data File Code (the PDF417 symbology) may be used to "encrypt"

14  the information, as described at col. 16:36-38.  However, one of skill in the art reading

15  this description would know that information modified using Symbol's Portable Data

16  File Code (the PDF417 symbology) is encoded, not encrypted.  In the mid-1990s,

17  "encryption" had a specific meaning to one of skill in the art in computer science: the

18  process of disguising a message in such a way as to hide its substance.  Bruce

19  Schneier, Applied Cryptography 1 (John Wiley & Sons, Inc. 1996).  Symbol's

20  Portable Data File Code (the PDF417 symbology), on the other hand, as its used here,

21  is merely formatting data on a media, such as a paper, that is readable by a bar code

22  reader. Information technology – Automatic Identification and Data Capture

23  Techniques – PDF417 Bar Code Symbology specification vii (ISO/IEC 2006).  When

24  using encoding, such as with the PDF417 symbology, the substance of the information

25  contained within a bar code is not hidden.  On the contrary, the purpose of encoding is

26  manifestly to make the substance of information contained with in a bar code, such as

27  one created with the PDF417 symbology, visible to a bar code reader.

28

107.   The encoding process described in Column 16 is formatting. This is illustrated first in column 16, which describes a preferred embodiment of the encoding process at lines 56-60:  "A preferred embodiment, illustrated in FIGS. 16A and 16B, will print the postage indicia separately from the encrypted message and other information (printed in a visually recognized form) such as the amount of postage imprinted on the card, the date, etc."  Earlier in the specification, Figures 16A and 16B are identified as examples of properly formatted data:  "FIGS. 16A and 16B illustrate two embodiments of print formats of the information entered into the 'E-STAMP' program," at col. 3:59-61.  The encoded portion displayed in Figures 16A and 16B is formatted to print the correct postage.  One of skill in the art, after reviewing the specification, claims, and prosecution history, would understand that encrypting, as used in column 16 is encoding, and encoding is "formatting data to be sent to a printer."

108.   The encoded portion displayed in Figures 16A and 16B is formatted to print the correct postage.  One of skill in the art as of 1995, after reviewing the specification, claims, and prosecution history, would understand that encrypting, as used in column 16 is encoding, and encoding is "formatting data to be sent to a printer."

109.   A person of ordinary skill in the art would know how to use the structure disclosed to perform the recited function.

**B.    Claim 7 of the '991 Patent**

    **1.    means, executing at least in part on the second subsystem, for transferring a predetermined amount of said representative value from the portable processor via the communication link to said second subsystem**

110.   Claim 7 of the '991 Patent recites "means, executing at least in part on the second subsystem, for transferring a predetermined amount of said representative

1    value from the portable processor via the communication link to said second

2    subsystem."

3        111.  A person of ordinary skill in the art would recognize the corresponding

4    structure to include the following:  "To enable information communication between

5    the portable processor device and the client system, the E-STAMP program is divided

6    into two modules, hereinafter the 'E-STAMP SERVER' and 'E-STAMP CLIENT'

7    modules.  These E-STAMP SERVER and E-STAMP CLIENT modules include

8    programs suitable for execution on processor-based systems."  (Ex. 32 ['991 Patent],

9    7:14-20)  "The E-STAMP CLIENT program is stored on the client system and

10   provides control for such functions as the entry of data, requesting postage from the

11   E-STAMP SERVER program, and printing of the postage indicia."  (Ex. 32 ['991

12   Patent], 7:24-27)

13       112.  A person of ordinary skill in the art would recognize the corresponding

14   structure to also include the following:

15       FIG. 1C, illustrates a computer network system for implementation of the

16       present invention.  This multiple processor system includes a client

17       processor-based system 10 and a host processor-based system 20.  In a

18       preferred embodiment, system 10 is utilized for implementing the

19       aforementioned E-STAMP CLIENT program while system 20 is utilized

20       for implementing the aforementioned E-STAMP SERVER program.

21       System 10 includes chassis 11 enclosing processor (CPU) 12 and disk

22       drive 14.  Coupled to CPU 12 is display 13, keyboard 15, mouse 16, and

23       network interface card (NIC) 104.  System 10 is coupled to computer

24       network 105 through NIC 104.  Furthermore, system 10 is adapted for

25       information communication with postage storage device 18 through

26       computer network 105 and system 20.  System 10 also includes modem

27       101 for communication through PSN 102, printer/label maker 19 and

28       scale 103.

> System 20 includes chassis 21 enclosing CPU 22 and disk drive 24.
> Coupled to CPU 22 is display 23, keyboard 25, mouse 26, and NIC 124.
> System 20 is coupled to computer network 105 through NIC 124.
> System 20 also includes modem 121 for communication through PSN
> 122, printer/label maker 29 and scale 123.

(Ex. 32 ['991 Patent], 8:60-9:14)

113.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

> Next, at step 708, return address box 803 is completed automatically or
> manually.  The address within 803 may be automatically entered from the
> adjoining word processor program, the address may be selected from a
> drop-down box (not shown), or the address may be manually input.  Any
> entered address may be saved within the E-STAMP program.
> Additionally, if a return address is not desired, it may be omitted.
> Thereafter, in step 709, the contents of address box 805 are entered in a
> manner similar to the contents of return address 803.

(Ex. 32 ['991 Patent], 15:37-47)

114.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

> Thereafter, in step 711, the user enters the weight of the package or letter
> associated with the postage indicia.  This weight may be entered
> manually, or automatically through the use of scale 103 coupled to
> processor-based system 10 in a manner well known in the art. I n step
> 712, the user selects the class of mail from the choices shown in box 809.
> Thereafter, in step 713, the user may select the location of routing
> information for the recipient address.  Such information will be
> automatically extracted from the address, and formatted in the PostNet
> symbology for ZIP+4 information, as provided in Postal Service

23

1    Publication 67 and incorporated herein by reference.  Thereafter, in step

2    714, the user may select a postal zone.  After step 713, at step 714, the

3    user may select the postal zone, such as local 1-8, Canada, Mexico, or

4    international.

5    (Ex. 32 ['991 Patent], 16:21-35)

6        115.   A person of ordinary skill in the art would recognize the corresponding

7    structure to also include the following:  "Lastly in step 715, the user confirms his/her

8    choice to print the postal indicia or not, thereby with the understanding that the

9    amount of postage will be deducted from the balance in the portable postage dispenser

10   182."  (Ex. 32 ['991 Patent], 16:66-17:2)

11       116.   A person of ordinary skill in the art would recognize the corresponding

12   structure to also include Figure 1C and Figure 7.  (Ex. 32 ['991 Patent], Figs. 1C, 7

13   (708-709, 711-715))

14       117.   Column 7, lines 14-20 describes two modules of the E-STAMP program,

15   which enable information communication between the portable processor device and

16   the client system. Column 8, lines 60-67 describes Figure 1C, depicting a computer

17   network system including client processor-based system 10 and host processor-based

18   system 20, utilized to implement the E-STAMP CLIENT and E-STAMP SERVER

19   modules.  Column 15, lines 37-57, column 16, lines 21-35, and Figure 7 describe in

20   steps 708-709 and 711-715 an algorithm for generating and sending the request that

21   causes the transfer of a predetermined amount of value.

22       118.   A person of ordinary skill in the art would know how to use the structure

23   disclosed to perform the recited function.

24   **2.    means, under control of the first subsystem, for queuing requests**

25   **from other ones of the affiliated subsystems, the requests being**

26   **communicated via the communication link, the requests seeking**

27   **transfer of individual predetermined amounts of the representative**

28   **value from the portable processor**

24

119.   Claim 7 of the '991 Patent recites "means, under control of the first subsystem, for queuing requests from other ones of the affiliated subsystems, the requests being communicated via the communication link, the requests seeking transfer of individual predetermined amounts of the representative value from the portable processor."

120.   A person of ordinary skill in the art would recognize the corresponding structure to include the following:

> The E-STAMP SERVER program is stored on the host system and provides control for such functions as queuing and servicing postage requests from a plurality of client systems, demanding a portion of the stored amount of postage from the device, and logging detailed information regarding postage requests.

(Ex. 32 ['991 Patent], 7:28-33)

121.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

> In a typical configuration, for example, many clients, each utilizing individual systems 10 and E-STAMP CLIENT programs, will be able to request postage from a single postage storage device 18 in combination with a single occurrence of the E-STAMP SERVER program. In such a configuration, the E-STAMP SERVER program provides centralized logistical control, such as queuing and servicing requests by ones of system 10.

(Ex. 32 ['991 Patent], 9:33-40)

122.   Column 7, lines 14-20 describes two modules of the E-STAMP program, the E-STAMP CLIENT module and the E-STAMP SERVER module. Column 8, lines 60-67 describes Figure 1C, which depicts a computer network system including client processor-based system 10, which implements the E-STAMP CLIENT module and host processor-based system 20, which implements the E-STAMP SERVER module.

25

1  Column 9, lines 38-41 which describes how the E-STAMP SERVER program

2  provides logistical control for queuing and servicing requests by ones of client

3  processor-based systems 10.

4      123.  The term "queuing" has a well understood meaning in the field of

5  computer science: queuing in a computer system refers to the collection, scheduling,

6  and dispatching of individual operations such as requests.  This process is essential to,

7  for example, managing requests or messages from a large community that arrive at a

8  central cite, such as a server. This is a well known subfield of computer science, the

9  principles and theory of which are defined in the book <u>Queuing Systems, Volume 1:</u>

10  <u>Theory,</u> by Leonard Kleinrock.  From my review of the claim language and the

11  citations to figures and the specification above, one of skill in the art would

12  understand the small number of programs or algorithms for queuing requests from

13  ones of client processor-based systems 10 as of October 2, 1996.  Examples of these

14  algorithms include FIFO (First-in-First-Out) and LIFO (Last-in-First-Out).  A person

15  skilled in the art reading the specification of the '991 patent would know that any of

16  these techniques could be used to queue incoming requests, would know the

17  algorithms to use and how to implement them.

18      124.  A person of ordinary skill in the art would know how to use the structure

19  disclosed to perform the recited function.

20  **C.**   **<u>Claim 23 of the '568 Patent</u>**

21      **1.**    **means for determining a value of said transaction associated with**

22      **two or more of said plurality of providers utilizing ones of said**

23      **transaction parameters**

24      125.  Claim 23 of the '568 Patent recites "means for determining a value of

25  said transaction associated with two or more of said plurality of providers utilizing

26  ones of said transaction parameters."

27      126.  A person of ordinary skill in the art would recognize the corresponding

28  structure to include the following:

1     Preferably, the invention operates to provide a user with information

2     regarding shipping an item via ones of the available shipping service

3     providers in order that the user may make an informed decision as to

4     which such provider to choose for a particular transaction. For example,

5     the user may make selections, such as a zone, delivery schedule, and

6     shipping weight, and be presented with the fees and other information,

7     such as service limitations, insurance availability, additional services, etc.,

8     associated with various ones of the shipping service providers associated

9     with these particular selections. Thereafter, the user may select a

10     particular shipping service provider and/or a particular service offered by

11     the shipping service provider and the invention operates to print an

12     indicia or other proof of payment or obligation for payment, i.e., a valid

13     waybill including user number and transaction number indicating

14     authorization for the shipping service provider to provide the service for

15     the designated fee.

16  (Ex. 34 ['568 Patent], 5:56-6:6)

17       127.   A person of ordinary skill in the art would recognize the corresponding

18  structure to also include the following:

19     The E-STAMP program will automatically incorporate the

20     aforementioned entered parameters--weight, class, zone--in order to

21     correctly calculate the correct postage or credit transaction authorization

22     to print in conjunction with the postage indicia . . . .

23

24     In order to present the user with information from which to make an

25     informed choice as to a particular shipping service provider by which to

26     ship the piece of mail or other item, the E-STAMP program may

27     calculate the fees associated with a plurality of the available shipping

28     service providers. Accordingly, the user may select shipping service

providers of interest (not shown) in order to allow the E-STAMP
program to determine the fees for only those shipping service providers.
Thereafter, the E-STAMP program may calculate and display fees
associated with shipping the item via the selected shipping service
providers according to the desired shipping and/or delivery parameters,
i.e., class, urgency, etc. Where a selected shipping service provider does
not provide a desired shipping and/or delivery parameter, the E-STAMP
program may indicate such and provide the fees for a service offered by
that particular shipping service provider most near that desired by the
user.

However, in the preferred embodiment, the E-STAMP program
automatically calculates the fees for each shipping service provider
offering service commensurate with the desired shipping and/or delivery
parameters. Additionally, the E-STAMP program may indicate other
ones of the shipping service providers which do not provide a desired
shipping and/or delivery parameter and provide the fees for a service
offered by that particular shipping service provider most near that desired
by the user, as well as indicate how their service differs from that desired.

(Ex. 34 ['568 Patent], 22:13-48)

128.   Read by one of ordinary skill in the art as of 1998, it is clear from the
context of the specification of the '568 Patent that column 22:13-18 refers to a
calculation for multiple providers.  For instance, "zone" is enumerated as one of the
parameters used in the calculation.  Directly before the above-quoted passage, the
specification reads, "the zone information may be presented for selection generically
and the E-STAMP program operate to determine zones for each of the particular
shipping service providers automatically."  (Col. 22:9-12) (emphasis added)
Moreover, directly following the quoted passage, repeated references are made to
multiple providers:  "In order to present the user with information from which to make

an informed choice . . . the E-STAMP program may calculate the fees associated with a plurality of the available shipping service providers," and "the E-STAMP program may calculate and display fees associated with shipping the item via the selected shipping service providers according to the desired shipping and/or delivery parameters, i.e. class, urgency, etc." (Col. 22:20-25 and 28-32) (emphasis added) Therefore, one of skill in the art, after reviewing the specification, claims, and prosecution history, would understand that the automatic incorporation of the entered transaction parameters and subsequent calculation of postage amount, as used in column 22, refers to a transaction involving multiple providers.

129.  A person of ordinary skill in the art would know how to use the structure disclosed to perform the recited function.

**D.    Claim 3 of the '777 Patent**

1.    **means for accepting a demand for a selected amount of value from a particular one of said plurality of processor systems via a data communication between said apparatus and said particular one of said processor systems, wherein said apparatus is adapted to substantially simultaneously accept demands from processor systems of said plurality in addition to said particular one of said processor systems**

130.  Claim 3 of the '777 Patent recites "means for accepting a demand for a selected amount of value from a particular one of said plurality of processor systems via a data communication between said apparatus and said particular one of said processor systems, wherein said apparatus is adapted to substantially simultaneously accept demands from processor systems of said plurality in addition to said particular one of said processor systems."

131.  A person of ordinary skill in the art would recognize the corresponding structure to include the following:  "The second PC stores a program, hereinafter referred to as the 'Meter' program, which verifies postage demands …"  (Ex. 35 ['777

Patent], 4:19-21)  "The remote postage meter stores a program, hereinafter referred to as the 'Meter' program, which verifies postage demands …"  (Ex. 35 ['777 Patent], 6:66-7:1)

132.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "Specifically, PC 10 is utilized to implement the aforementioned Meter program . . . ."  (Ex. 35 ['777 Patent], 7:6-8)

133.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

> Referring again to FIG. 1A, it can be seen that PCs 10 and 20 may be linked together through Public Switched Network (PSN) 103 via modems 101 and 102. PSN 103 may be comprised of any number of now existing or later to be developed communications means.  In the preferred embodiment, PSN comprises public telecommunications lines and switching equipment.  Alternatively, PSN 103 comprises digital communication over the Internet or similar wide area public gateway. Additionally, PCs 10 and 20 may be linked directly through digital telecommunications trunks (not shown) or through a digital network system, cable system, or satellite system (all not shown).  It shall be understood that in utilizing a digital network system to link PCs 10 and 20 that modems 101 and 102 are replaced by network interface cards (NIC) or other digital communications devices, e.g., ISDN.

(Ex. 35 ['777 Patent], 8:24-38)

134.   [Reserved]

135.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "Subsequent to establishing a data communications link, the Meter program accepts a demand transmitted from a demand site (step 303), returning to step 303 if no demand has yet been received and

1  proceeding to step 304 if a demand has been received."  (Ex. 35 ['777 Patent], 14:47-
2  51)

3     136.   A person of ordinary skill in the art would recognize the corresponding
4  structure to also include the following:  "Accepting a demand includes the substep of
5  decrypting the demand utilizing a decryption key available at PC 10 where encryption
6  of the demand is used."  (Ex. 35 ['777 Patent], 14:53-55)

7     137.   A person of ordinary skill in the art would recognize the corresponding
8  structure to also include Figure 1A and Figure 3.  Figure 1A shows a client computer
9  connected to a server computer and a plurality of independent value credits.  Figure 3
10  shows a flow diagram of the meter process.  (Ex. 35 ['777 Patent], Figs. 1A, 3 (303)

11     138.   Column 4, lines 19-21, col. 6:66-7:1, col. 7:6-8, and col. 8:24-38 all
12  describe a second (remote) PC that runs the meter program as described in the
13  specification and the network between a first PC and the second (remote) PC.  Figure
14  3 (step 303, including the substep of decrypting the demand), describes how this
15  second (remote) PC and aforementioned meter program perform the function of
16  accepting a demand for a selected amount of value from a particular one of a plurality
17  of processor systems via a data communication between the apparatus and the
18  particular one of said processor systems.  Column 14, lines 47-51 describe step 303,
19  where "[s]ubsequent to establishing a data communications link, the Meter program
20  accepts a demand transmitted from a demand site (step 303), returning to step 303 if
21  no demand has yet been received and proceeding to step 304 if a demand has been
22  received."  From my review of the claims, the specification of the '777 Patent, and the
23  prosecution history of the application from which the '777 Patent issued, one of skill
24  in the art would have been able to determine the algorithm described in steps 303,
25  including the substep of decrypting the demand, of Figure 3 as the structure that
26  performs the function "to accept a demand for a selected amount of value from a
27  particular one of a plurality of processor systems via a data communication between
28  the apparatus and the particular one of said processor systems."  One of skill in the art

31

would understand the bounds of the algorithm disclosed in steps 303, including the substep of decrypting the demand, of Figure 3.

139.    A person of ordinary skill in the art would know how to use a data communication link for performing the data communication needed for accepting a demand.

140.    A person of ordinary skill in the art would know how to use a decryption key to perform decrypting, a substep of accepting a demand.  As encryption was widely understood and practiced at the time, a person of ordinary skill in the art would know how to use the structure disclosed to perform the recited function.

## 2.    means for automatically deducting said selected amount of value from one or more of said value credits

141.    Claim 3 of the '777 Patent recites "means for automatically deducting said selected amount of value from one or more of said value credits."

142.    A person of ordinary skill in the art would recognize the corresponding structure to include the following:  "Specifically, PC 10 is utilized to implement the aforementioned Meter program . . . ."  (Ex. 35 ['777 Patent], 7:6-8)  "Furthermore, PC 10 is preferably adapted for receiving postal credit stored in portable memory 15 through a receiving device 14.  In an alternative embodiment, disk drive 13 is utilized for storing postal credit received by PC 10, such as through modem 101.  Of course, in this embodiment receiving device 14 and portable memory 15 may be omitted if desired.  However, receiving device 14 and portable memory 15 may still be utilized in this embodiment, such as for the PPK as discussed below."  (Ex. 35 ['777 Patent], 7:17-26)

143.    A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "At step 305, the Meter program uses funding information found within the demand to determine if proper funding is available for the transaction."  (Ex. 35 ['777 Patent], 15:25-27)  The Meter program described

32

1   determines if proper funding is available for the transaction automatically, without
2   user intervention.

3       144.   A person of ordinary skill in the art would recognize the corresponding
4   structure to also include the following:

5       Funding for the postage demanded may be accomplished in various ways.
6       The user of the on-demand postage system may have a credit or debit
7       account with the postage provider or may utilize point of sale funding
8       methods such as a valid bank card account.  Use of credit and debit
9       accounts require the user to supply the postage provider with certain
10      information prior to the postage demand.  In the case of a credit account,
11      the user may be periodically billed for postage previously demanded.  In
12      the case of a debit account, the user prepays for postage to be demanded
13      in the future.  Upon making demands for postage, costs of the transaction
14      are deducted from the user's debit account.

15  (Ex. 35 ['777 Patent], 15:27-39)

16      145.   A person of ordinary skill in the art would recognize the corresponding
17  structure to also include the following:

18      Alternatively, the Meter program deducts the amount of postage to be
19      used by the postage indicia from a postage credit, such as may be stored
20      in a portable memory 15 coupled to PC 10 through receiving device 14,
21      available at PC 10 (step 306).  Where multiple amounts of postage credit
22      are stored at PC 10, such as through the use of the aforementioned array
23      of portable memories, step 306 may include a determination of an
24      available postage credit for use in the present transaction.  Such a
25      determination may include a determination as to a particular postage
26      credit not currently utilized in responding to a demand for postage from
27      another Demand program, a particular postage credit having sufficient
28      value to provide the demanded amount of postage, a determination of a

1    combination of postage credits suitable for providing the demanded

2    amount of postage, or the like.

3  (Ex. 35 ['777 Patent], 16:55-17:3)

4    146.   A person of ordinary skill in the art would recognize the corresponding

5  structure to also include Figure 1A and Figure 3.  Figure 1A shows a client computer

6  connected to a server computer and a plurality of independent value credits.  Figure 3

7  shows a flow diagram of the meter process.  (Ex. 35 ['777 Patent], Figs. 1A, 3 (306))

8    147.   Column 7:6-8 describes a second (remote) PC that runs the meter

9  program as described in the specification.  Column 15, lines 25-27 and 35-39 describe

10  how the meter program uses funding information found within the demand to

11  determine if proper funding is available for the transaction.  It further provides that

12  funding for the postage demanded can be accomplished in various ways, including a

13  debit account. As col. 15:35-39 provides, "In the case of a debit account, the user

14  prepays for the postage to be demanded in the future.  Upon making demands for

15  postage, costs of the transaction are debited from the user's debit account."  Figure 3

16  (step 306) depicts how this second (remote) PC and aforementioned meter program

17  perform this debiting. As described in column 16, lines 55-59, "the Meter program

18  deducts the amount of postage to be used by the postage indicia from a postage credit,

19  such as may be stored in a portable memory 15 coupled to PC 10 through receiving

20  device 14, available at PC 10 (step 306)."  A person skilled in the art reading the

21  claims of the '777 Patent, the specification of the '777 Patent, and the prosecution

22  history of the application from which the '777 Patent issued, would have understood

23  the bounds of claim, including what structure is disclosed in the specification for

24  performing the claimed function "to automatically deduct a selected amount of value

25  from one or more value credits" and "to automatically deduct at least a portion of the

26  predetermined amount of value from at least one value credit."

27    148.   A person of ordinary skill in the art would know how to use the structure

28  disclosed to perform the recited function.

**E.**   **Claim 63 of the '777 Patent**

    **1.**   **means for summarily indicating a desired piece of information of a plurality of information records stored external to said first system**

149.   Claim 63 of the '777 Patent recites "means for summarily indicating a desired piece of information of a plurality of information records stored external to said first system."

150.   A person of ordinary skill in the art would recognize the corresponding structure to include the following:  "PC 20 is utilized to implement the Demand program."  (Ex. 35 ['777 Patent], 7:6-8)

151.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

Moreover, the destination address information provided in step 204 may be a shorthand designation of a desired destination address.  Accordingly, an address book or database may be utilized by the present invention in completing the destination address.  This address book may be stored locally, such as by PC 20 generating the demand according to the present invention, or may be central, such as at PC 10 metering the postage according to the present invention.  As will be discussed in detail below, there are advantages provided in centrally storing such address information.  Additionally, whether stored locally or centrally, an address book or other database may be utilized to provide additional information utilized in demanding and printing postage according to the present invention.  For example, selection of a particular shorthand, and thus a particular destination address, may also select a printing format, a postal zone, a postal class, and/or information regarding the postal indicia form utilized as discussed below.  Alternatively, the short hand designation may be utilized to select any of the above information items either alone or in any combination.

35

(Ex. 35 ['777 Patent], 9:33-53)

152.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

> Additionally, as discussed above, the destination address may be a shorthand designation of a desired destination address and/or other information.  Accordingly, where an address book, or other database, of information associated with a particular user or demanding system is maintained at PC 10, step 311 may include reference to the database in order to determine the desired information, such as the destination address.  It shall be appreciated that this embodiment of the present invention provides several advantages.  Specifically, as only a shorthand designation of a potentially long string of information is communicated, more efficient use of the available bandwidth may be realized. Additionally, as information, such as the destination address, is maintained at a centralized system, this information may be easily and constantly updated as well as updated off line in order to more quickly service demands for postage.  For example, as a postal customer files a notice of change of address, this centrally stored address book may be updated to reflect the changed information.  It shall be appreciated that the central address book or other database may not in fact store a complete set of the desired information, but may instead store pointers to a common database, such as an official postal service database, in order to facilitate updating of the information for example.

(Ex. 35 ['777 Patent], 16:20-44)

153.   Column 7:6-8 and 10-12 describes a client processor-based system that implements the Demand program and a host processor-based system that implements the Meter program.  The Demand program executes steps 204 and 210 of Figure 2. Step 204 depicts how the Demand program accepts the postal item destination address

36

1    or other information and provides that this destination address, or other information,

2    as described at col. 9:22-23.  Col. 9:33-35 also provides that this entered address or

3    other information may be used as shorthand, which in turn may be used to select a

4    printing format, a postal zone, a postal class, and/or information regarding the postal

5    indicia form utilized, as well as other information as described at col. 9:46-54.

6        154.   The specification of the '777 Patent also provides that at step 210,

7    information entered by a user, such as the address or other information entered at step

8    204, is assembled into a demand, which is of a format suitable for communication to,

9    and acceptance by, a remote metering device as described at col. 11:21-12:16.

10       155.   Column 16 further provides that where the destination address entered by

11   the user at step 204 is shorthand information, and an address book or other database of

12   information is associated with a particular user is maintained at the remote PC, step

13   311 may include reference to the database in order to determine desired information,

14   such as the destination address or other information.  This description is provided at

15   col. 16:20-44.  From my review of the claims, the specification of the '777 Patent, and

16   the prosecution history of the application from which the '777 Patent issued, one of

17   skill in the art would understand that steps 204 and 210 of Figure 2 disclose an

18   algorithm for performing the function "to summarily indicate a desired piece of

19   information of a plurality of information records stored external to the first system"

20   and would understand the algorithm described therein.

21       156.   A person of ordinary skill in the art would know how to use the structure

22   disclosed to perform the recited function.

23       **2.    means for creating a demand for said desired amount of value, said**

24              **demand comprising selected ones of said parameters in combination**

25              **with said summary indication**

26       157.   Claim 63 of the '777 Patent recites "means for creating a demand for said

27   desired amount of value, said demand comprising selected ones of said parameters in

28   combination with said summary indication."

158.   A person of ordinary skill in the art would recognize the corresponding structure to include the following:  "The first PC stores a program, hereinafter referred to as the 'Demand' program, accepts information from a user, a coupled device, or the context in which the postal item is being created or sent regarding the amount of desired postage and the mail piece for which it is needed. The demand program subsequently makes a demand for postage to a remote postage meter."  (Ex. 35 ['777 Patent], 4:10-16)

159.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "Referring to FIG. 1A, there are illustrated processor-based systems 10 and 20 utilized in the preferred embodiment of the present invention."  (Ex. 35 ['777 Patent], 7:4-6)  "Likewise PC 20 includes chassis 21 enclosing CPU 22 and disk drive 23 and includes keyboard 26."  (Ex. 35 ['777 Patent], 7:10-12)

160.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

> Subsequent to accepting information, the Demand program assembles
> predetermined portions of this information into a demand which is of a
> format suitable for communication to, and acceptance by, a remote
> metering device (step 210).  Preferably, assembly step 210 includes the
> substeps of determining what information the user desires to be included
> in the generated postage indicia, determining if an accompanying bar
> code is desired, and if so, determining what information is to be included
> therein, and determining the amount of postage the postage indicia
> should indicate.

(Ex. 35 ['777 Patent], 11:21-31)

161.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "Assembly step 210 includes the use of an encryption process to encrypt the demand which is to be sent via PSN 103.

38

Subsequent to the assembly of the demand, the Demand program initiates a public key encryption process well known in the art to encrypt the demand."  (Ex. 35 ['777 Patent], 12:6-10)

162.   A person of ordinary skill in the art would recognize the corresponding structure to also include Figure 1A and Figure 2.  (Ex. 35 ['777 Patent], Figs. 1A, 2 (210))

163.   According to PSI's expert, the "means for summarily indicating a desired piece of information ..." recited in claim 55 also lacks support, despite the fact that the specification expressly identifies the structure: a client computer that provides a shorthand designation of desired information, such as a destination address, printing format, or information involved in creating the postal indicia. (Ex. 35 ['777 Patent], Fig. 2 (204); 9:33-53)  Similarly, the "means for creating a demand for said desired amount of value, ..." is also purportedly unsupported, despite the fact that the specification discloses that the Demand program "assembles predetermined portions of this information into a demand which is of a format suitable for communication to, and acceptance by, a remote metering device (step 210)."  (Ex. 35 ['777 Patent], 11:21-25)  The information referenced in the specification is the information entered by the customer to define the postage demand, which is set forth at Figure 2, steps 203-209.  In addition, the creation step "includes the use of an encryption process to encrypt the demand which is to be sent via PSN 103."  (Ex. 35 ['777 Patent], 12:6-8)

164.   A person of ordinary skill in the art would know how to use the structure disclosed to perform the recited function.

**3.    means for automatically deducting at least a portion of said predetermined amount of value from at least one of said value credits**

165.   Claim 63 of the '777 Patent recites "means for automatically deducting at least a portion of said predetermined amount of value from at least one of said value credits."

39

166.   A person of ordinary skill in the art would recognize the corresponding structure to include the following:  "Specifically, PC 10 is utilized to implement the aforementioned Meter program . . . ."  (Ex. 35 ['777 Patent], 7:6-8)  "Furthermore, PC 10 is preferably adapted for receiving postal credit stored in portable memory 15 through a receiving device 14.  In an alternative embodiment, disk drive 13 is utilized for storing postal credit received by PC 10, such as through modem 101.  Of course, in this embodiment receiving device 14 and portable memory 15 may be omitted if desired.  However, receiving device 14 and portable memory 15 may still be utilized in this embodiment, such as for the PPK as discussed below."  (Ex. 35 ['777 Patent], 7:17-26)

167.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "At step 305, the Meter program uses funding information found within the demand to determine if proper funding is available for the transaction."  (Ex. 35 ['777 Patent], 15:25-27)  The Meter program described determines if proper funding is available for the transaction automatically, without user intervention.

168.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "Funding for the postage demanded may be accomplished in various ways.  The user of the on-demand postage system may have a credit or debit account with the postage provider or may utilize point of sale funding methods such as a valid bank card account.  Use of credit and debit accounts require the user to supply the postage provider with certain information prior to the postage demand.  In the case of a credit account, the user may be periodically billed for postage previously demanded.  In the case of a debit account, the user prepays for postage to be demanded in the future.  Upon making demands for postage, costs of the transaction are deducted from the user's debit account."  (Ex. 35 ['777 Patent], 15:27-39)

169.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

> Alternatively, the Meter program deducts the amount of postage to be
> used by the postage indicia from a postage credit, such as may be stored
> in a portable memory 15 coupled to PC 10 through receiving device 14,
> available at PC 10 (step 306).  Where multiple amounts of postage credit
> are stored at PC 10, such as through the use of the aforementioned array
> of portable memories, step 306 may include a determination of an
> available postage credit for use in the present transaction.  Such a
> determination may include a determination as to a particular postage
> credit not currently utilized in responding to a demand for postage from
> another Demand program, a particular postage credit having sufficient
> value to provide the demanded amount of postage, a determination of a
> combination of postage credits suitable for providing the demanded
> amount of postage, or the like.

(Ex. 35 ['777 Patent], 16:55-17:3)

170.   A person of ordinary skill in the art would recognize the corresponding structure to also include Figure 1A and Figure 3.  Figure 1A shows a client computer connected to a server computer and a plurality of independent value credits.  Figure 3 shows a flow diagram of the meter process.  (Ex. 35 ['777 Patent], Figs. 1A, 3 (306))

171.   Column 7:6-8 describes a second (remote) PC that runs the meter program as described in the specification.  Column 15, lines 25-27 and 35-39 describe how the meter program uses funding information found within the demand to determine if proper funding is available for the transaction.  It further provides that funding for the postage demanded can be accomplished in various ways, including a debit account.  As col. 15:35-39 provides, "In the case of a debit account, the user prepays for the postage to be demanded in the future.  Upon making demands for postage, costs of the transaction are debited from the user's debit account."  Figure 3

41

(step 306) depicts how this second (remote) PC and aforementioned meter program perform this debiting. As described in column 16, lines 55-59, "the Meter program deducts the amount of postage to be used by the postage indicia from a postage credit, such as may be stored in a portable memory 15 coupled to PC 10 through receiving device 14, available at PC 10 (step 306)." A person skilled in the art reading the claims of the '777 Patent, the specification of the '777 Patent, and the prosecution history of the application from which the '777 Patent issued, would have understood the bounds of claim, including what structure is disclosed in the specification for performing the claimed function "to automatically deduct a selected amount of value from one or more value credits" and "to automatically deduct at least a portion of the predetermined amount of value from at least one value credit."

172.    A person of ordinary skill in the art would know how to use the structure disclosed to perform the recited function.

**F.    Claim 17 of the '451 Patent**

**1.    means for querying one or more databases, containing set up data on one or more printer drivers, to determine set up data for a user's printer**

173.    Claim 17 of the '451 Patent recites "means for querying one or more databases, containing set up data on one or more printer drivers, to determine set up data for a user's printer."

174.    A person of ordinary skill in the art would recognize the corresponding structure to include the following:

Printing postal indicia requires specific information about a user's printer and its associated printer driver. The servers 20a-20m include information and server based printer databases that is accessible by the PCs 10a-10n. The server based printer database may contain information, such as for example, model number, printer driver, print specifications (margins, etc).

1      Additionally, a client-based printer database, may be located on the

2      user's machine.  The client-based printer database may include a forms

3      database that defines which media types are supported (e.g., envelopes,

4      labels, postcards and the like) and the dimensions of each of these media.

5      In an exemplary embodiment of the present invention the print engine

6      accesses the forms database to locate and print the indicium, delivery

7      address, and return address.

8      Referring to FIG. 3B, when a user first tries to setup a printer with the

9      client software, the server-based printer database is queried to determine

10     if the user's printer driver information is contained within the database.

11     If the printer information is in the database the required information is

12     available and the user may continue.  If the printer driver is not in the

13     database, the user performs several tests to determine the required

14     information with the guidance of a software wizard.

15  (Ex. 37 ['451 Patent], 6:26-50)

16     175.   A person of ordinary skill in the art would recognize the corresponding

17  structure to also include the following:

18     In an exemplary embodiment of the present invention, the client software

19     may gather set-up information through database queries or manually with

20     the use of a printer configuration software wizard.  An exemplary

21     embodiment of the present invention creates a dynamic database that

22     alleviates the need to require all users to provide specific information

23     about their printer.  The dynamic printer database may be updated for the

24     entire user community whenever a user manually sets-up a new printer.

25     In one embodiment, the dynamic database may be maintained on the

26     server of the postal provider.  The dynamic database may contain

27     information, such as for example, model number, printer driver, print

28     specifications (margins, etc) and which media the printer is allowed to

1    support as well which media the printer is not allowed to support.  This

2    allows the postal provider to remotely control the type of media and

3    printers that are or are not available for use.

4    (Ex. 37 ['451 Patent], 9:1-17)

5        176.   A person of ordinary skill in the art would recognize the corresponding

6    structure to also include the following:  "The print engine preferably uses the

7    information in the Registry along with the aforementioned tables in the client support

8    database to determine which printer drivers are available for use as well as the print

9    media that may be supported by each of the available printers. If a user works offline,

10   the client software may use Registry values without being connected to the support

11   server to access the server-based printer database."  (Ex. 37 ['451 Patent], 9:56-63)

12       177.   A person of ordinary skill in the art would recognize the corresponding

13   structure to also include the following:

14       The printer configuration information table is the main table in the print

15       server database.  It contains information on printer drivers, such as for

16       example, the version number, compatible operating systems, and the print

17       media the drivers support.  The printer configuration information table

18       may also store the lowest version of the printer driver that meets all the

19       criteria in the table.  The printer engine compares the driver version

20       number of a user's printer with the driver version(s) listed in the database.

21       The printer engine preferably breaks up the string based on punctuation

22       and then compares the numerical groups.  If letters are included in the

23       driver version, the engine does a character by character comparison.

24       The printer configuration information table may also store an offset or

25       shift code for the default paper feed tray supported by this driver.  The

26       shift code represents how the guides of the paper feed trays are moved to

27       properly feed envelopes into the printer.  The shift code tells the printer

28       engine where to place the image on the larger virtualized sheet of paper.

44

1    If the printer does not shift the image at all, this value is preferably set to
2    zero. If the printer shifts the image to the middle of the page, this value
3    is preferably set to one. If the printer shifts the image across the page,
4    this value is preferably set to two. A print test may be run to determine
5    the proper shift code.

6    The printer configuration information table stores a variable indicating
7    whether a given print driver supports virtualization and printing on
8    envelopes as well as non envelope print media such as, for example, post
9    cards or labels. If a user attempts to print to a print media not supported
10   by the selected printer, the system preferably informs the user that their
11   printer does not support the selected print media and allows the user to
12   select a new printer or select a new print media.

13   (Ex. 37 ['451 Patent], 9:64-10:32)

14   178. A person of ordinary skill in the art would recognize the corresponding
15   structure to also include the following:

16   An exemplary logical flow diagram of the printer setup component is
17   shown in FIG. 25. An initial default printer selection screen 121 allows
18   the user to select a default printer. A print onto screen 122 then prompts
19   the user to select an envelope size to be used for printer setup testing.
20   Next the system may determine 124 whether the default printer selected
21   by the user is stored in the server based printer database. If the default
22   printer is not included in the database the system defaults to a printer
23   trouble shoot wizard 126 to determine the feed offset for the selected
24   default printer.

25   (Ex. 37 ['451 Patent], 19:41-51)

26   179. Querying a database is frequently used and widely understood in the field
27   of computer science. A person of ordinary skill in the art would be familiar with the
28   meaning of database queries, and understand there are a small number of ways to

45

1  create database queries.  A person of ordinary skill in the art would know how to use
2  this structure for querying a database.

3    **2.    means for storing results of said printer configuration test in said one**
4         **or more databases for use by subsequent users**

5    180.   Claim 17 of the '451 Patent recites "means for storing results of said
6  printer configuration test in said one or more databases for use by subsequent users."

7    181.   A person of ordinary skill in the art would recognize the corresponding
8  structure to include the following:

9         In an exemplary embodiment of the present invention, the process of
10        printing postal indicia begins with the characterization of a default printer
11        through the collection of set-up information regarding that printer's
12        performance characteristics and default settings 77. Set-up information
13        may include for example, how the printer rotates into landscape mode,
14        what print media/paper the printer supports, what feed tray options the
15        printer supports or other default information.
16        In an exemplary embodiment of the present invention, the client software
17        may gather set-up information through database queries or manually with
18        the use of a printer configuration software wizard.  An exemplary
19        embodiment of the present invention creates a dynamic database that
20        alleviates the need to require all users to provide specific information
21        about their printer.  The dynamic printer database may be updated for the
22        entire user community whenever a user manually sets-up a new printer.
23        In one embodiment, the dynamic database may be maintained on the
24        server of the postal provider.  The dynamic database may contain
25        information, such as for example, model number, printer driver, print
26        specifications (margins, etc) and which media the printer is allowed to
27        support as well which media the printer is not allowed to support. This

28

46

allows the postal provider to remotely control the type of media and printers that are or are not available for use.

The server-based printer database may use a plurality of tables in a user support database to store information about printer drivers. For example, a printer configuration information table may be used to store information on known printer drivers (printer drivers that have been tested successfully, either in house or by a consensus of users' results) and the print media they support. Similarly a printer global configuration table may be used to store settings that affect all printer drivers, both known and unknown, and a printer database update table may be used to store the results generated when a customer configures a previously unknown printer.

(Ex. 37 ['451 Patent], 8:59-9:29)

182.  A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "In addition to these tables, information that is specific to a customer's printers (i.e. driver version numbers, whether or not a printer has been configured, etc.) may be stored in the Registry."  (Ex. 37 ['451 Patent], 9:30-33)

183.  A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

The printer configuration information table may also store an offset or shift code for the default paper feed tray supported by this driver.  The shift code represents how the guides of the paper feed trays are moved to properly feed envelopes into the printer.  The shift code tells the printer engine where to place the image on the larger virtualized sheet of paper. If the printer does not shift the image at all, this value is preferably set to zero.  If the printer shifts the image to the middle of the page, this value is preferably set to one.  If the printer shifts the image across the page,

47

1        this value is preferably set to two.  A print test may be run to determine

2        the proper shift code.

3    (Ex. 37 ['451 Patent], 10:11-22)

4        184.   A person of ordinary skill in the art would recognize the corresponding

5    structure to also include the following:

6        When a client configures a printer, the results of the configuration may

7        be saved in the printer database update table.  As a result, this table

8        contains information about both known and unknown printer drivers so

9        that there is overlap between the fields of this table and the fields in the

10       printer configuration information table.  The information in the

11       overlapping fields for a new printer driver may be transferred to the

12       printer configuration information table after numerous customers, on the

13       order of five to twenty, have successfully configured the printer driver

14       with the same operating system, version number, and shift code.

15       The system preferably stores a user identification to identify the user that

16       configured the printer driver in this record.  This identification is

17       preferably a unique number assigned to a user when they registered with

18       the on-line postal provider.  The printer database update table may store

19       the text name of the printer driver that the user configures, the driver

20       version, the computer operating system used when the printer driver was

21       configured and the date the driver was configured.

22   (Ex. 37 ['451 Patent], 11:22-41)

23       185.   A person of ordinary skill in the art would recognize the corresponding

24   structure to also include the following:  "Once an offset is determined for a given

25   printer the offset is preferably stored in the dynamic printer database so that future

26   users who have the same printer may not have to exercise the wizard program to

27   determine the printer offset. Rather, future users preferably obtain the offset

28   information from the dynamic printer database."  (Ex. 37 ['451 Patent], 13:36-41)

186.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:  "If the printed sample matches the displayed postage the system may upload 138 print parameters for the selected default printer into the server based print database."  (Ex. 37 ['451 Patent], 19:63-65)

187.   "Storing in a database" has a well understood meaning to a person of ordinary skill in the art, and the skilled artisan would understand that there are a small number of ways to store in a database as described in the specification.  A person of ordinary skill in the art would know how to use these techniques to perform the recited function.

**3.     means for querying one or more databases to determine a printer offset as a function of how the print media is fed into a printer**

188.   Claim 17 of the '451 Patent recites "means for querying one or more databases to determine a printer offset as a function of how the print media is fed into a printer."

189.   A person of ordinary skill in the art would recognize the corresponding structure to include the following:

Printing postal indicia requires specific information about a user's printer and its associated printer driver.  The servers 20a-20m include information and server based printer databases that is accessible by the PCs 10a-10n.  The server based printer database may contain information, such as for example, model number, printer driver, print specifications (margins, etc).

Additionally, a client-based printer database, may be located on the user's machine.  The client-based printer database may include a forms database that defines which media types are supported (e.g., envelopes, labels, postcards and the like) and the dimensions of each of these media.  In an exemplary embodiment of the present invention the print engine accesses

the forms database to locate and print the indicium, delivery address, and
return address.

Referring to FIG. 3B, when a user first tries to setup a printer with the
client software, the server-based printer database is queried to determine
if the user's printer driver information is contained within the database. If
the printer information is in the database the required information is
available and the user may continue. If the printer driver is not in the
database, the user performs several tests to determine the required
information with the guidance of a software wizard.

(Ex. 37 ['451 Patent], 6:26-50)

190. A person of ordinary skill in the art would recognize the corresponding
structure to also include the following:

In an exemplary embodiment of the present invention, the process of
printing postal indicia begins with the characterization of a default printer
through the collection of set-up information regarding that printer's
performance characteristics and default settings 77. Set-up information
may include for example, how the printer rotates into landscape mode,
what print media/paper the printer supports, what feed tray options the
printer supports or other default information.

In an exemplary embodiment of the present invention, the client software
may gather set-up information through database queries or manually with
the use of a printer configuration software wizard. An exemplary
embodiment of the present invention creates a dynamic database that
alleviates the need to require all users to provide specific information
about their printer. The dynamic printer database may be updated for the
entire user community whenever a user manually sets-up a new printer.
In one embodiment, the dynamic database may be maintained on the
server of the postal provider. The dynamic database may contain

50

information, such as for example, model number, printer driver, print specifications (margins, etc) and which media the printer is allowed to support as well which media the printer is not allowed to support.  This allows the postal provider to remotely control the type of media and printers that are or are not available for use.

The server-based printer database may use a plurality of tables in a user support database to store information about printer drivers.  For example, a printer configuration information table may be used to store information on known printer drivers (printer drivers that have been tested successfully, either in house or by a consensus of users' results) and the print media they support.  Similarly a printer global configuration table may be used to store settings that affect all printer drivers, both known and unknown, and a printer database update table may be used to store the results generated when a customer configures a previously unknown printer.

(Ex. 37 ['451 Patent], 8:59-9:29)

191.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

The printer configuration information table is the main table in the print server database.  It contains information on printer drivers, such as for example, the version number, compatible operating systems, and the print media the drivers support.  The printer configuration information table may also store the lowest version of the printer driver that meets all the criteria in the table.  The printer engine compares the driver version number of a user's printer with the driver version(s) listed in the database. The printer engine preferably breaks up the string based on punctuation and then compares the numerical groups.  If letters are included in the driver version, the engine does a character by character comparison.

51

The printer configuration information table may also store an offset or shift code for the default paper feed tray supported by this driver. The shift code represents how the guides of the paper feed trays are moved to properly feed envelopes into the printer. The shift code tells the printer engine where to place the image on the larger virtualized sheet of paper. If the printer does not shift the image at all, this value is preferably set to zero. If the printer shifts the image to the middle of the page, this value is preferably set to one. If the printer shifts the image across the page, this value is preferably set to two. A print test may be run to determine the proper shift code.

The printer configuration information table stores a variable indicating whether a given print driver supports virtualization and printing on envelopes as well as non envelope print media such as, for example, post cards or labels. If a user attempts to print to a print media not supported by the selected printer, the system preferably informs the user that their printer does not support the selected print media and allows the user to select a new printer or select a new print media.

(Ex. 37 ['451 Patent], 9:64-10:32)

192.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

An exemplary logical flow diagram of the printer setup component is shown in FIG. 25. An initial default printer selection screen 121 allows the user to select a default printer. A print onto screen 122 then prompts the user to select an envelope size to be used for printer setup testing. Next the system may determine 124 whether the default printer selected by the user is stored in the server based printer database. If the default printer is not included in the database the system defaults to a printer

trouble shoot wizard 126 to determine the feed offset for the selected
default printer.

(Ex. 37 ['451 Patent], 19:41-51)

193.   "Storing in a database" has a well understood meaning to a person of ordinary skill in the art, and the skilled artisan would understand that there are a small number of ways to store in a database as described in the specification, e.g. by an SQL insertion.  A person of ordinary skill in the art would know how to use these techniques to perform the recited function.

**G.     Claim 32 of the '808 Patent**

**1.     means for sending a print job having one or more patterns to said printer**

194.   Claim 32 of the '808 Patent recites "means for sending a print job having one or more patterns to said printer."

195.   A person of ordinary skill in the art would recognize the corresponding structure to include the following:  "If the set-up information on the print driver of the user's printer was not in the dynamic printer database, an exemplary embodiment of the present invention utilizes a wizard program to initially determine printer offset. The wizard program preferably generates one or more test shapes that are printed on a test envelope by the user's printer."  (Ex. 38 ['808 Patent], 13:45-51)

196.   A person of ordinary skill in the art would recognize the corresponding structure to also include the following:

A print configuration wizard may be initiated if print parameters for the
default printer are not stored in the server based printer database, or if the
sample QA envelope (see FIG. 25) does not match the displayed
envelope. A logic flow diagram of an exemplary print configuration
wizard is shown in FIG. 33. Referring to FIG. 34, a test printer screen
preferably prompts the user to place an envelope in the printer feed tray.
The test printer screen advises the user that a sample envelope needs to

53

Case 2:06-cv-07499-ODW-CT     Document 461     Filed 09/24/2009     Page 55 of 56

be printed to determine whether the user's printer can print postal indicia and instructs the user to insert the envelope short edge first 183. When the user selects "Next>", a test pattern including, for example, a circle, a square, and a triangle may be printed 186 (FIG. 33) on the envelope inserted into the printer.

One of ordinary skill in the art will appreciate that the test pattern is not limited to the described combination of shapes. Rather the test pattern may comprise, for example, any combination of shapes, symbols, letters or numbers. Alternatively, a single character may also be used, wherein the printer offset may be determined in accordance with how the single character prints on a test envelope. Therefore, the described test pattern is by way of example and not by way of limitation.

(Ex. 38 ['808 Patent], 21:54-22:9)

197.   A person of ordinary skill in the art would recognize the corresponding structure to also include Figures 33-37.  (Ex. 38 ['808 Patent], Figs. 33-37)  Figure 33 is a flow diagram of a print configuration wizard.  Step 186 illustrates the step of printing a test envelope.  Figure 34 is a capture of a test printer screen informing the user that a sample envelope will need to be printed to determine whether the user's printer can accurately print postage.  Figures 35-37 are diagrams illustrating a series of test patterns printed onto a test envelope to determine the printer offset.

198.   Furthermore, the number of programs or algorithms for sending a print job having one or more patterns to a printer is relatively small, and these algorithms are readily apparent to a person of ordinary skill in the art.  A "means for sending a print job ... to said printer" has a well understood meaning: the means for sending a print job are printer control languages, such as PCL or Postscript.  Not only are these languages well understood, they are both standardized and universally supported by commodity printers.

McDANIEL DECLARATION ISO STAMPS.COM'S OPPOSITION TO MSJ RE INVALIDITY

1  print job are printer control languages, such as PCL or Postscript.  Not only are these

2  languages well understood, they are both standardized and universally supported by

3  commodity printers.

4      199.   A person of ordinary skill in the art would know how to use the structure

5  disclosed to perform the recited function.

6

7      I declare under penalty of perjury under the laws of the United States of

8  America that the foregoing is true and correct.

9

10     Executed on September 24, 2009, at State College, Pennsylvania.

11

12

13                                    Patrick McDaniel

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28