P-SEND / ENTER

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STAMPS.COM, INC., | ) Case No. CV 06-7499 ODW (CTx) |
| Plaintiff, | ) ORDER GRANTING |
| | ) DEFENDANTS' MOTION FOR |
| vs. | ) SUMMARY JUDGMENT OF |
| | ) INVALIDITY AND DENYING |
| | ) PLAINTIFF'S MOTIONS FOR |
| ENDICIA, INC. and PSI SYSTEMS, | ) SUMMARY JUDGMENT |
| INC., | ) |
| Defendants. | ) |
| _____ | ) |

## I.    INTRODUCTION

These motions for summary judgment arise from Defendants Endicia, Inc. and PSI Systems, Inc.'s alleged infringement of the following United States Patents: U.S. Patent No. 5,717,597 ("the '597 Patent"); U.S. Patent No. 5,812,991 ("the '991 Patent"); U.S. Patent No. 6,208,980 ("the '980 Patent"); U.S. Patent No. 6,233,568 ("the '568 Patent"); U.S. Patent No. 6,249,777 ("the '777 Patent"); U.S. Patent No. 6,889,214 ("the '214 Patent"); U.S. Patent No. 6,965,451 ("the '451 Patent"); and U.S. Patent No. 6,982,808 ("the '808 Patent"). The patents-in-suit are directed toward systems and methods for customers to purchase and store United States postage using a secure computer network. The postage can then be printed from a customer's home

or office printer onto an envelope or label for mailing. Plaintiff contends that Defendants have developed technology that infringes the patents-in-suit.

Defendants have a number of patented inventions and products related to Internet postage that pre-date Plaintiff's patents. Thus, Defendants argue that the patents-in-suit are invalid as obvious and/or indefinite and thus move for summary judgment. For the reasons set forth below, Defendants' Motion for Summary Judgment of Invalidity is GRANTED and Plaintiff's Motions for Summary Judgment are DENIED as moot.

II.    BACKGROUND

In 1982, Dr. Harry Whitehouse founded PSI Associates and is Chief Development Officer for Defendant Endicia, Inc. In the early 1990s, Dr. Whitehouse and his company worked for the U.S. Postal Service ("USPS") writing facilities-based computer programs. To help the USPS add bar codes to postage, Dr. Whitehouse developed a word processing macro that could use existing laser printers to print POSTNET bar codes on the USPS's envelopes. Throughout the late 1980s and early 1990s, Dr. Whitehouse developed additional, improved systems that allowed customers to print addresses, postage amounts, bar codes, and personal greetings on envelopes and labels from their home computers and printers. In August 1991, Dr. Whitehouse filed a patent application for his PC postage system. In 1992, Defendants copyrighted their DAZ-zle software, which enables customers to create and print addresses, postage amounts, graphics, and bar codes from their PCs. Dr. Whitehouse has subsequently filed additional patent applications for improvements and additions to his PC postage system.

In 1994, Salim Kara, who subsequently transferred her patents to Plaintiff, filed a patent disclosing a type of postage system, in which postage value was stored on a memory device and attached to a customer's PC. In 1996, Kara filed an application

for the '991 Patent, which disclosed a system by which postage value could be requested by and delivered to a customer over a network (such as the Internet). Subsequently, with the invention of the '777 Patent, systems offering postage over a network could be scaled to large communities of customers by employing multiple postage storage devices. Later, the '214 Patent claimed a system in which account data for multiple customers was stored in each postage storage device and requests for postage were processed using a secure encryption tool.

In addition, Kara developed other patents for use in conjunction with PC postage. With the invention of the '597 Patent, a user could customize postage indicia to include, for example, a company logo or birthday message. The '980 Patent disclosed and claimed a way to request and receive outbound and return postage indicia. The '568 Patent discloses a system that allows a user to compare postage rates of multiple providers, e.g. USPS, FedEx, and UPS. The '451 and '808 Patent made it possible to use a standard printer to print postage using the systems developed by E-Stamp and Stamps.com.

In April 2001, Stamps.com acquired the entire patent portfolio of the company that Kara founded, E-Stamp Corporation, which owned the rights to Kara's patents in the field of Internet postage.    Because the patents-in-suit are quite complicated, a brief summary of what is contained in each of Plaintiff's patents will be helpful.

## A.    U.S. Patent No. 5,717,597

The '597 Patent is directed to a system and method for printing a postage meter stamp, including a desired postage amount and a personalized postage indicia onto a label or an envelope for use in conjunction with a computer-generated greeting card. A processor based system is programmed to interact with a customer to produce individualized greeting cards, printed address labels, and a printed postage meter stamp having a customized postage indicia. The processor-based system will automatically calculate the postage due for a specific greeting card, print that postage

1    amount as a meter stamp, interact with the customer to generate a personalized stamp

2    indicia, encrypt selected information into a machine-readable format, and print the

3    information entered by the customer in a selected format.

4    **B.    U.S. Patent No. 5,812,991**

5    The '991 Patent is directed to a system and method for printing postage indicia,

6    including a desired postage amount, onto a piece of mail. A user takes a

7    postal-dispensing device to, or establishes information communication with, an

8    authorized agent of a postal authority in order to obtain a replenishment of the amount

9    of postage stored within the portable postage dispensing device. A desired amount of

10   postage is entered into the dispensing device by an authorized agent through a host

11   processor-based system. The user is then able to access this stored postage at the

12   user's location through a network of processor-based systems. By using the network

13   of processor-based systems the user is able to couple the portable dispensing device

14   to a first processor-based system and then allow distribution of postage amounts to

15   multiple networked processor-based systems. These networked processor-based

16   systems may then print an authorized postage indicia on a postal item.

17   **C.    U.S. Patent No. 6,208,980**

18   The '980 Patent is directed to a system and method for printing an outbound

19   and/or an associated return postage meter stamp, including a desired postage amount,

20   onto a label or onto an outbound document and/or an associated return document. A

21   processor-based system is programmed to interact with a customer to produce

22   individualized documents, printed address labels, and a printed postage meter stamp

23   having in one embodiment, a customized postage indicia. The processor based system

24   automatically calculates the postage due for each specific document, prints that

25   postage amount as a meter stamp, interacts with the customer to generate a

26   personalized stamp indicia, encrypts selected information into a machine-readable

27   format, and prints the information entered by the customer in a selected format, all on

28                                            4

the document or documents for transfer to the outside of a mailing envelope.

### D.    U.S. Patent No. 6,233,568

The '568 Patent is directed to a system and method for dispensing postage or other authorization information electronically by using a portable processor containing a maximum amount of preauthorized postage which can be applied to any piece of mail or other item. A plurality of shipping service providers may utilize the portable processor to store and dispense credit value for authorization of various shipping services. Accordingly, a user is presented with information regarding various shipping service providers' fees and/or services associated with particular shipping/delivery parameters desired by the user in order to make an informed choice as to a most preferable method of shipment.

### E.    U.S. Patent No. 6,249,777

The '777 Patent is directed at a system and method for remote postage metering of postage indicia, including demanding a desired postage amount and subsequently printing the postage indicia onto a piece of mail. A user inputs certain necessary information, as well as additional desired information, into a local processor-based system. The local system then assembles a postage demand in suitable format and transmits the same to a remote postage-metering device. The remote postage metering device then verifies the demand for authority to demand and validate funding. Upon verification, the remote postage meter assembles a data packet representing an authorized postage indicia. The data packet is transmitted to the local system for printing.  Printing of the postage indicia may be unaccompanied, or may include additional information. Such additional information may include destination and return address, machine readable routing or identification information, or a complete document to be posted.

### F.    U.S. Patent No. 6,889,214

The '214 patent is directed to a system and method for remote postage metering

1    of postage indicia, including demanding a desired postage amount and subsequently

2    printing the postage indicia onto a piece of mail.

3        **G.    U.S. Patent No. 6,965,451**

4        The '451 Patent is directed to a method and system for printing information

5    onto a print media.  In one aspect the invention may be utilized by an on-line postage

6    system to query one or more databases, containing set up data on one or more printer

7    drivers, to determine set-up data for a user's printer.  The invention may then be used

8    to perform a printer configuration test to determine the set-up data for the user's

9    printer if the set up data is not contained in the databases.  The invention then stores

10   the results of the printer configuration test in one or more of the databases for use by

11   subsequent users.

12       **H.    U.S. Patent No. 6,982,808**

13       The '808 Patent is directed toward a method and system for printing

14   information onto a print media.  In one aspect the present invention may be utilized

15   by an on-line postage system to generate a print job for a virtualized sheet having an

16   image of a envelope contained within a printable region of the virtualized sheet.  The

17   print job for the virtualized sheet is then forwarded to a printer which prints the postal

18   indicia onto the envelope.

19   ///

20   ///

21   ///

22

23

24

25

26

27

28                                          6

III.    DISCUSSION

    **A.    Legal Standards**

        1.    <u>Summary Judgment</u>

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tarin v. County of L.A.*, 123 F.3d 1259, 1263 (9th Cir. 1997), *superseded by statute on other grounds as stated in Leisek v. Brightwood Corp.*, 278 F.3d 895, 899 n.2 (9th Cir. 2001).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323-24 (1986). That burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323-34; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).

Only genuine disputes—where the dispute is over facts that might affect the outcome of a suit under the governing law and allow a reasonable jury to return a verdict for the nonmoving party—can preclude the entry of summary judgment. *See Anderson*, 477 U.S. at 248; *see also Aprin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (noting that the nonmoving party must present specific evidence from which a reasonable jury could return a verdict in its favor).

Where the moving party bears the burden of proof at trial, the moving party

1  must present evidence, which if uncontroverted, would entitle it to prevail. *UA Local*

2  *343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). Once the moving

3  party has established a *prima facie* case, the non-moving party must produce evidence

4  to contradict it in order to survive summary judgment. *Celotex Corp.*, 477 U.S. at

5  323-24; *see also Anderson*, 477 U.S. at 248

6          2.    Anticipation: 35 U.S.C. § 102

7          "A patent is invalid for anticipation if a single prior art reference discloses each

8  and every limitation of the claimed invention." *Schering Corp. v. Geneva*

9  *Pharmaceuticals*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citing *Lewmar Marine, Inc.*

10 *v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987)). "Moreover, a prior art reference

11 may anticipate without disclosing a feature of the claimed invention if that missing

12 characteristic is necessarily present, or inherent, in the single anticipating reference."

13 *Id*. (citing *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir.

14 1991)). "Although § 102 refers to 'the invention' generally, the anticipation inquiry

15 proceeds on a claim-by-claim basis." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d

16 1323, 1334 (Fed. Cir. 2008). "[D]isclosure of each element is not quite enough–[the

17 Federal Circuit] has long held that '[a]nticipation requires the presence in a single

18 prior art disclosure of all elements of a claimed invention *arranged as in the claim*.'"

19 *Id*. at 1334-35 (quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.

20 Cir. 1983)). While a prior art disclosure that "almost" meets the § 102 standard may

21 render the claim invalid on obviousness grounds under § 103, it does not anticipate.

22 *Sears, Roebuck & Co.*, 722 F.2d at 1548.

23          3.    Obviousness: 35 U.S.C. § 103

24          An issued patent is presumed valid. 35 U.S.C. § 282. To overcome this

25 presumption, the party challenging a patent's validity must prove the facts that

26 establish invalidity by clear and convincing evidence. *Moba, B.V. v. Diamond*

27 *Automation, Inc.*, 325 F.3d 1306, 1319 (Fed. Cir. 2003). According to 35 U.S.C §

28                                        8

103(a), a patent is invalid if the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a); *KSR Int'l Co. v. Teleflex, Inc. et al.*, 550 U.S. 398, 406 (2007). Further, obviousness at the time of the invention can be shown if "a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

The Supreme Court has provided a framework for applying § 103, noting that "[w]hile the ultimate question of patent validity is one of law, the § 103 condition . . . lends itself to several basic factual inquiries." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966) (internal citation omitted). Under Section 103: (1) the scope and content of the prior art are to be determined; (2) differences between the prior art and the claims at issue are to be ascertained; and (3) the level of ordinary skill in the pertinent art resolved. *KSR*, 550 U.S. at 406. "Against this background the obviousness or nonobviousness of the subject matter is determined." *Id*. In addition, "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Id*. As indicia of obviousness or nonobviousness, these inquiries have relevancy. *Id*. at 406-407. The Supreme Court further emphasized the need for courts to value "common sense" over "rigid preventative rules." *Id*. at 421; *see also Leapfrog Enter., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007) ("An obviousness determination is not the result of a rigid formula disassociated from the consideration of the facts of a case.").

**B.     Analysis**

Because there are a number of patents and patent claims before the Court, it will

serve the organizational structure of the Court's analysis to examine each patent independently while, at the same time, examining the corresponding prior art. Thus, the Court will begin its analysis with Plaintiff's patent that was filed first in time.

### 1.    The '597 Patent

Plaintiff's '597 Patent issued February 10, 1998 based on U.S. Patent Application No. 08/540,658 filed October 11, 1995. (UF,[1] 1.) The '597 Patent is titled "System and Method for Printing Personalized Postage Indicia on Greeting Cards." (UF, 1.) Claim 7 of the '597 Patent depends from dependant claim 6, which in turn depends from independent claim 1. Claim 7, as rewritten to incorporate the claims from which it depends, reads as follows:

> A processor-based system for printing a desired amount of postage for mailing a document created within said system, wherein the system is under the control of a set of instructions from a document generating program and a separate postage generating program, said system comprising: an interface program integrating said document generating program with said postage generating program; means for temporary coupling said integrated programs to a postage storage device; means for automatically calculating a correct amount of postage for a particular one of said documents as a function of mailing parameters entered into said system and specific to said particular document; means for formatting data to be sent to a printer coupled to said system, wherein said formatted data is operable to print said correct amount of postage; means for selectively creating a postage indicia together with said correct amount of postage; and means for printing said created postage and postage indicia. Wherein said printing means prints said created postage and postage indicia on a transfer medium for subsequent transfer to a mailing envelope. Further including: means for transferring said printed postage and indicia from said transfer medium to a mailing envelope.

(UF, 3.)

---

[1] The Court cites to Defendants' Statement of Undisputed Facts ("UF").

*i.     Scope and Content of the Prior Art*

Defendants argue that its DAZ-zle/Envelope Manager Systems and its 5,319,562 patent ("Defendants' '562 Patent") are prior art that individually and collectively invalidate as obvious claim 7 of the '597 Patent.

a.     <u>Defendants' '562 Patent</u>

Defendants' '562 Patent titled "System and Method for Purchase and Application of Postage Using Personal Computer" issued on June 7, 1994 and was based on U.S. Patent Application No. 07/748,823 filed August 22, 1991. (UF,104.) Defendants' '562 Patent teaches a system in which users purchase postage from the postal authority via modem communication and use a postage printing program in the computer for directing the printer to print addresses and postage on envelopes and labels. (UF, 106.)  Defendants' '562 Patent teaches a system that uses a printer to create postage and postage indicia that can be printed on a transfer medium for subsequent transfer to a mailing envelope. (UF, 112, 113.)

b.     <u>DAZ-zle Program</u>

Defendants' DAZ-zle is a software program offered for sale, sold, and distributed by PSI since at least 1991, including DAZ-zle Designer 1997 and the DAZ-zle User's Guide version 2.5 (1992-1995). (UF, 347.)  The DAZ-zle software is embodied by a program of instructions executable by a computer. (UF, 347.) DAZ-zle teaches a method of printing information onto print media, including envelopes, labels, and flyers.  (UF, 348.)

The earliest version of the Defendants' DAZ-zle system was copyrighted no later than 1992. (UF, 307.)  The earlier versions of the DAZ-zle system (e.g. version 2.5) allowed users to calculate and print the postage rate required for mailing an envelope.  (UF, 308.) Plaintiff disputes this fact. However, the DAZ-zle User's Guide clearly states that the user can calculate and print postage.  (PSI 01167821.) The DAZ-

zle system version 2.5 allowed users to add graphics to their mail pieces. (UF, 309.)

It appears undisputed that Defendants' '562 Patent and the first edition of the DAZ-zle and DAZ-zle User's Guide are prior art to the '597 Patent. To determine the relevancy of a prior art, the court must first determine if the prior art reference is within the scope of the inventor's endeavor. *See In re Wood*, 599 F.2d 1032, 1036 (C.C.P.A. 1979). If it is not, the court applies a second test to determine if the nature of the problem confronting the inventor is within the scope of the prior art. *Id.* The scope of a prior art must be analogous to the asserted patent at issue. *See In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992). A prior art is analogous if it is from the same "'field or endeavor,' even if it addresses a different problem, or, [is] not within the same field, if the [prior art] reference is 'reasonably pertinent to the particular problem with which the inventor is involved.'" *In re Conte*, 36 Fed.Appx. 446, 450 (Fed. Cir. 2002) (citing *In re Clay*, 966 F.2d at 658-59).

Here, there is no question that both Defendants' '562 Patent and the DAZ-zle program are within the same field or endeavor as the '597 Patent. It is also clear when examining the earlier DAZ-zle system and Defendants' 562 Patent that these two pieces of prior art purport to solve that which is contained within claim 7 of the '597 Patent, namely a "means for transferring said printed postage and indicia from said transfer medium to a mailing envelope." ('597 Patent, claim 7.)

A point that further supports invalidity is the fact that the PTO did not consider the most pertinent prior art when issuing the '597 Patent. (*See* '597 Patent, title page.) The Supreme Court has noted that the rationale underlying the presumption of validity seems "much diminished" when the PTO does not consider the most pertinent prior art. *KSR*, 550 U.S. at 426.

In sum, there is no material issue of fact in dispute pertaining to the relevancy of the prior art. The Court finds that both Defendants' '562 Patent and the DAZ-zle program version 2.5 constitute relevant prior art because they are "reasonably

pertinent" to the problem that the inventor of the '597 Patent was attempting to solve. The prior art addresses printing postage onto an envelope or label, calculating and printing the amount of postage, and printing graphic images/greetings on envelopes and labels. Therefore, the Court's inquiry pertaining to the scope of the prior art tips in favor of invalidating claim 7 of Plaintiff's '597 Patent.

ii.    *Differences Between the Prior Art and the Claimed Invention*

Under the second prong of the *Graham* analysis, differences between the prior art and the claims at issue should be determined from the vantage point of the hypothetical person with ordinary skill in the art. *See Graham*, 383 U.S. at 17-18; *Velander v. Garner*, 348 F.3d 1359, 1363-64 (Fed. Cir. 2003). "Differences between prior art and the claimed invention are 'ascertained by interpretation of the *teachings* of the prior art and the claims of the patent.'" CHISUM ON PATENTS, § 5.03[5], 5-239 (2003) (emphasis added).

The Federal Circuit has expressed the importance of referring to the actual claims in defining an invention:

> The claims of the patent provide the concise formal definition of the invention. They are numbered paragraphs which 'particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his [or her] invention. It is to these wordings that [courts] must look to determine whether there has been infringement. Courts can neither broaden or narrow the claims to give the patentee something different than what he [or she] has set forth.

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (internal and citations and quotations marks omitted) (citing *Autogiro Co. of Am. v. U.S.*, 384 F.2d 391, 395-96 (Ct. Cl. 1967)). Therefore, the Court should first look to the claims of the patent-in-suit to determine if there are meaningful differences between a patent claims and the prior art.

Here, the exact language of claim 7 and its dependant claims has been set forth above. In addition, the only '597 Patent term that was disputed at the claim

construction hearing was "postage indicia" as it is used in claim 7. The Court construed "postage indicia" as: "A printed postage designation on a mail piece or label that includes the amount of postage, and may include an arbitrary or fanciful graphic configuration and/or a machine readable encrypted message." The question now becomes what differences exist when comparing the Court's construction with the prior art. It is clear simply by looking at Figure 1 in the DAZ-zle User's Manual that everything described in construction of "postage indicia" can be accomplished using DAZ-zle. The user can print a postage designation in the form of the postage amount and a POSTNET bar code. The DAZ-zle user can also print a fanciful graphic configuration as shown with the "Happy Birthday Mom" message in DAZ-zle's Figure 1. The only difference may be that claim 7 of the '597 Patent calls for "a machine readable encrypted message" whereas DAZ-zle only shows a bar code and FIM code. Thus, it is debatable whether the bar codes are in fact considered "machine readable encrypted messages." The '597 Patent suggests that bar codes and machine-readable messages are one and the same. (*See* '597 Patent, 6: 63-65) (explaining "The encrypted information 37 will be in a machine-readable graphical security interface such as a standard bar code."). Further, Defendants' '562 Patent has related similarities.

In sum, the Court finds little difference between the teachings of the prior art and the claims of the patent-in-suit. It is clear that the prior art fairly "suggests" that which is found in claim 7 of the '597 Patent. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1551 (Fed. Cir. 1983). Therefore, it appears that the '597 Patent should be invalidated as obvious.

Moreover, the Supreme Court stated that "rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead there must be some articulated reasoning with some rational underpinning to support the legal conclusion." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir.

2006)). However, as the Court further articulated, "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.*; *see also Yamanouchi Pharm. Co., Ltd., v. Danbury Pharm., Inc*., 231 F.3d 1339, 1343 (Fed. Cir. 2000) (noting that "the suggestion to combine requirement stands as a critical safeguard against hindsight analysis and rote application of the legal test for obviousness.").

Here, not only does the DAZ-zle program and Defendants' '662 Patent "suggest" that which is found in the '597 Patent, but it is also practically the same idea and invention. Thus, the suggestion to combine requirement is not as relevant to the Court's analysis. In fact, the '597 Patent may also very well be invalid as anticipated under § 102, but the Court need not reach that conclusion here.

*iii.     The Level of Ordinary Skill in the Pertinent Art*

To determine the level of ordinary skill in the art, courts must consider the educational level of the inventor, the educational level of those who work in the relevant industry, and the sophistication of the technology involved. *Ryko Mfg. Co. v. Nu-Star, Inc*., 950 F.2d 714, 719 (Fed. Cir. 1991). Defendants assert that a person of ordinary skill in the art will have "at least a masters degree in computer science (or equivalent), together with a specialization in cryptography and security, and at least one year's experience in the electronic postage metering industry." (UF, 486.) Plaintiff alleges that a person of ordinary skill in the art "will have at least a background in software systems, networking, and security design, and specific training in these fields at least at an advanced undergraduate level (courses and senior thesis) or graduate coursework in these areas." (UF, 486.)

Here, both Plaintiff's and Defendants' descriptions are similar. It appears that Plaintiff argues the person of ordinary skill in the art may be slightly less specialized than what Defendants propose. While inconsequential, the Court adopts Plaintiff's

proposed level of ordinary skill in the art.

### iv.    Secondary Considerations

Such considerations as commercial success, long felt but unsolved needs, and the failure of others to invent are relevant to the obviousness inquiry. *Graham*, 383 U.S. at 17-18. However, these considerations do not control the obviousness inquiry. *See Richardson-Vicks v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1992) (citing *Newell Cos., Inc., v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988)). Instead, they assist the Court in ascertaining the extent of any objective indicia of non-obviousness.

Here, the parties have not raised any secondary considerations. The Federal Circuit has frequently stated that "secondary consideration evidence" such as commercial success, copying, and long-felt need does not necessarily overcome a strong showing of obviousness. *See Leapfrog*, 485 F.3d at 1162; *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007); *Ryko Mfg. Co.*, 950 F.2d at 719-20. Therefore, the Court will not delve into secondary considerations because there has already been a strong showing of obviousness.

### 2.    The '991 Patent

The '991 patent, titled "System and Method for Retrieving Postage Credit Contained Within a Portable Memory Over a Computer Network," issued September 22, 1998 based on U.S. Patent Application No. 08/727,833 filed October 2, 1996. The '991 patent claims a system and method for printing postage indicia onto a piece of mail, which permits multiple customers to access the central processor system. Claim 7 requires that requests from multiple users be in a queue to use the central system. Claim 42 describes the use of a portable memory device to transfer an amount of postage from the central system to the users' systems. Claim 76 describes the use of the Internet and a refreshable memory device to effect the transfer of an amount of postage. Both claims 7 and 76 require the use of a "portable processor device." Claim

42 requires the use of a "portable memory device." In addition, claim 76 requires that the monetary value information be "passed blindly" from one processor to the other.

Defendants argue that claims 7, 42, and 76 of the '991 patent are anticipated under 35 U.S.C. § 102(a) or obvious under section 103. Defendants contend that the relevant prior art is a 1993 article titled *Crytography: It's Not Just for Electronic Mail Anymore* by J.D. Tygar and Bennet Yee ("the 1993 Tygar-Yee article") and Defendants' '562 Patent.

Before getting to the merits of Defendants' arguments, Plaintiff argues that the 1993 Tygar-Yee article should not be considered prior art because there is no proof that the article was published prior to the critical date for the '991 patent. Section 102 provides in relevant part that an invention is not patentable if it was "described in a printed publication" either before the invention was conceived by the inventor or more than one year prior to the filing date of the application from which the patent issued. 35 U.S.C. § 102(a), (b).

As Defendants point out, however, when Plaintiff submitted its patent applications to the USPTO in 2000, it readily admitted on information disclosure statements that the 1993 Tygar-Yee article was published on March 1, 1993. (Smith Decl. Exs. A-C.) Defendants have also submitted another article by Tygar and Yee published in January 1994 that cites to the 1993 Tygar-Yee article using March 1, 1993 as its publication date. Therefore, Defendants have proven by clear and convincing evidence that the 1993 Tygar-Yee article is prior art to the '991 patent.

> i.    *Scope and Content of the Prior Art*

The 1993 Tygar-Yee article teaches a first processor-based system that is capable of responding to a given user's demand for representative value by distributing representative value to the user's processor-based system via a communication link, where the distributed representative value is drawn from a portable processor device coupled to the first processor-based system.

17

The 1993 Tygar-Yee article teaches that "[a] secure coprocessor is an ideal place to perform secure, private computation such as that required in *all* cryptographic protocols. A secure coprocessor is a hardware module containing (1) a CPU, (2) ROM, and (3) NVM (non-volatile memory) . . . . Such a hardware module can be used to store cryptographic keys without risk of release of those keys." (1993 Tygar-Yee article, section 3, p.5.) The article also teaches of a method for reloading postage meters remotely via a secure on-line transaction between the home user and the USPS. (Id., section 5.2, pp.12-13.)

Similarly, Defendants' '562 patent describes "[a] distributed computer system [that] enables end-users having personal computers to purchase postage from the post authority." ('562 Patent, Abstract.) Further, the '562 patent teaches of "[e]nd-user computers [that] each include a modem for communicating with a computer at the postal authority, a secure non-volatile memory for storing postal usage and remaining postage information, a postage meter control program that includes a program for communicating with the postal authority to purchase postage and for updating the contents of the secure non-volatile memory." (Id.)

> ii.    *Differences Between the Prior Art and the Claimed Invention*

As stated above, the Court should first look to the claims of the patent-in-suit to determine if there are meaningful differences between the patent claims and the prior art. Claim 7 of the '991 patent depends from independent claim 1. Claim 7, as rewritten to incorporate the claim from which it depends, reads as follows:

A closed metering system for transferring a value having representative value stored therein coupled to a first processor-based subsystem to selected ones of a plurality of affiliated individual processor-based subsystems via a communications link coupling said first subsystem and said selected affiliated subsystem, said closed metering system comprising: a second processor-based subsystem, the first subsystem and second subsystem being ones of the plurality of affiliated subsystems, wherein at least one of the first and second processor-based subsystems is operable to perform non-metering functions; means executing at least in part on the second subsystem, for transferring a predetermined amount

of said representative value from the portable processor via the communication link to said second subsystem; and means for printing an indicia having value in the predetermined amount of said representative value. [claim 7] further comprising: means, under control of the first subsystem, for queuing requests from other ones of the affiliated subsystems, the requests being communicated via the communication link, the requests seeking transfer of individual predetermined amounts of the representative value from the portable processor.

(UF, 18.)

While the above is unnecessarily convoluted, it is critical for the Court to analyze the actual meaning of claims 1 and 7. It appears that the processor-based subsystem is merely referring to a word-processor program on a user's PC, such as Microsoft Word or a mail program. In the specification to the '991 patent, when explaining a problem the '991 patent seeks to solve, the author states, "the system should optimally interface with a user friendly operating environment that is flexible and can be coupled to other programs such as a word processing or graphic program." ('991 Patent, 2: 48-53.) The 1993 Tygar-Yee article speaks to the very problem the '991 intends to solve. The 1993 Tygar-Yee article states, "[t]he basic idea is simple: [] obtain the destination and return addresses and weight/delivery class from the user – directly from the *word processor* running on the user's PC via the local network." (1993 Tygar-Yee article, section 5, pp.11-12) (emphasis added).

The 1993 Tygar-Yee article also teaches what is stated in claims 1 and 7 regarding securely transferring value from the "first system" (e.g., a home PC or postage meter) to "affiliated systems" (e.g., a USPS system) via a communications link. One of the primary goals of the '991 patent is to "provide a system and method to dispense postage in a secure manner" ('991 Patent, 2: 53-56) via a secured communication network. The 1993 Tygar-Yee article teaches, "regardless of whether an electronic [PC-based] postage meter uses a phone or a direct wire connection to update its postage credit, some method must be used to protect the meters' communication with the local post office." (1993 Tygar-Yee article, section 5.2, pp.12-13; *see also* section 5, p.11 (discussing the "PC-based" postage meter)).

There are differences when comparing the '991 patent, as a whole, to the 1993 Tygar-Yee article.  However, claim 7 itself appears to be an obvious next step when considering the teachings of the 1993 Tygar-Yee article. This, of course, weighs in favor of finding invalidity.

Defendants also attack claims 42 and 76 of the '991 patent. Claim 42 focuses on a postage value being stored on a "portable memory device" and "a method for transferring a pecuniary value from a portable memory device coupled to a first general purpose processor-based system to a second general purpose processor-based system via a communication link" and "queuing information communication between said first system and a plurality of processor-based systems, the information communication comprising requests by one[] of the plurality of systems for pecuniary value from said portable memory." (UF, 19.)

In addition, claim 76, which Defendants argue is invalid, speaks to "coupling a refreshable memory device for storing monetary equivalent value to said first system [and] transferring said predetermined amount of monetary equivalent value from the second system to the refreshable memory device coupled to said first system via said communication link, said predetermined amount of monetary equivalent value being passed blindly by said first system from said second system to said refreshable memory." (UF, 20.)

The 1993 Tygar-Yee teaches a system comprising hardware devices such as (1) a CPU, (2) ROM, and (3) NVM. (1993 Tygar-Yee article, section 3, p.5.) Further, as stated above, the article teaches a method of transferring monetary values via a communications link from the PC storage device to the USPS network. (*See* 1993 Tygar-Yee article, section 5.2, pp.12-13.)

Similarly, Defendants' '562 patent "provides a convenient method to purchase U.S. postage via phone/modem, the ability to maintain a computerized account of postage expenditures, and provisions for remote electronic audit functions." ('562

Patent, 1: 14-19.)

Plaintiff's primary argument regarding the differences between the '991 patent and the prior art is that the '991 patent recites "means . . . for queuing requests" from multiple users who intend to add value to their postage accounts whereas the prior art does not. However, Defendants rebut this point by explaining their experts testimony that the 1993 Tygar-Yee article teaches that a secure coprocessor will be able to handle concurrent transactions from multiple computers and that the PC-based postage meter processes postage requests from various PCs as does a networked laser printer receiving print requests in an office environment.

While perhaps Defendants' '562 patent and the 1993 Tygar-Yee article does not anticipate all that is contained within the '991 patent, it teaches a method that foresees the '991 patent as an obvious next step to a person skilled in the art. Therefore, the Court finds claims 7, 42, and 76 of the '991 patent invalid as obvious under section 103.

3.    The '980 Patent

The '980 patent issued March 27, 2001, based on U.S. Patent Application No. 08/965,015 filed November 5, 1997. (UF, 28.) The '980 patent is titled "System and Method for Printing Multiple Postage Indicia." Claim 35 of the '980 patent claims a system for generating both outbound and return postage documents with a postage indicia printed on them. Claim 35 depends on independent claim 34. Claim 35 reads, "[t]he system of claim 34, wherein at least one of said generating means includes: means for selecting one of a plurality of graphical configurations of a postage indicia; and means for personalizing said selected graphical configuration." ('980 Patent, 25: 41-45.)

The scope and content of the prior art was substantially covered in the above sections pertaining to Defendants' DAZ-zle/Envelope Manager Systems and its '562 patent. Defendants explain that the earliest versions of the DAZ-zle/Envelope

21

Manager system were commercialized in this country in the early 1990s. Defendants note that the earlier DAZ-zle system could calculate and print actual postage and allowed users to select graphics or "rubber stamps" for insertion on the envelope or other document. The '562 patent teaches a system and method for purchase and application of postage using a PC. Users purchase postage from the postal authority via modem communication and use a postage printing program in the computer for directing the printer to print addresses and postage, including the amount, on envelopes and labels.

The analysis here resembles that which was fleshed out above when the Court invalidated the '597 patent. Thus, it is not necessary to repeat the technical aspects related to the scope and content of the prior art.

Plaintiff argues that the one difference between the '980 patent and the prior art is that the '980 patent allows a user to personally modify a greeting whereas the DAZ-zle system only offers fixed graphics/greetings that cannot be modified. The obviousness of claim 35 is a prime example of why the Supreme Court encourages "common sense" over "rigid preventative rules" in an obviousness analysis. *See KSR*, 550 U.S. at 421. It is clear from Figure 1 of the DAZ-zle User's Guide that a user can insert a fanciful greeting (e.g., Happy Birthday Mom) on his or her printed envelope. And an obvious next step from a printed, fixed greeting is to allow a user to personalize that greeting with a name, age, etcetera. This would be obvious, to say the least, to someone skilled in the art. Further, contrary to Plaintiff's arguments, the prior art does not teach away from allowing users to modify a personalized greeting. Accordingly, claim 35 or the '980 patent is deemed invalid as obvious.

    4.    The '568 Patent

Defendants argue that claim 23 of the '568 patent is invalid as indefinite under 35 U.S.C. § 112. "It is well settled that 'if one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what

is meant by that language.'" *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (quoting *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc)). "If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have 'failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112,' which renders the claim invalid for indefiniteness." *Id.* (quoting *In re Donaldson Co.*, 16 F.3d at 1195).

Claim 23 depends on claim 21 of the '568 patent. The pertinent part of claim 21 reads, "means for determining a value of said transaction associated with two or more of said plurality of providers utilizing one[] of said transaction parameters."

Plaintiff argues that the relevant structure is contained in the specification where it states, "the invention operates to provide a user with information regarding shipping an item via one[] of the available shipping service providers. . . . For example, the user may make selections, such as a zone, delivery schedule, and shipping weight, and be presented with the fees and other information, such as service limitations, insurance availability, additional services, etc. associated with various . . . shipping service providers associated with these particulate selections. Thereafter, the user may select a particular shipping service provider . . . and the invention operates to print an indicia or other proof of payment or obligation for payment." ('568 Patent, 5: 55-6: 6.) Further, so that the user can "make an informed choice as to a particular shipping provider . . . the E-stamp program may calculate the fees associated with . . . available shipping service providers. Accordingly, the user may select service providers of interest. . . . Thereafter, the E-Stamp program may calculate and display fees associated with shipping the item via the selected shipping service providers according to the desired shipping and/or delivery parameters." ('568 Patent, 22: 20-38.)

Defendants argue that the specification merely reiterates the claim's function

without actually describing the structure. The Court agrees. The specification fails to describe a program that will determine the value (i.e., a program that links to the shipping companies' websites or provides other means of ascertaining the shipping companies' data). Further, the claim states that there will be a comparison with "two or more" of the shipping providers, but there is no mention in the specification of how this comparison will be performed. As in the *Blackboard, Inc.* case, the portions of the specification Plaintiff cites offer "simply an abstraction that describes the function . . . which is *performed by some undefined component of the system*." *Blackboard, Inc.*, 574 F.3d at 1383 (emphasis added). Accordingly, the Court finds claim 23 of the '568 Patent invalid as indefinite.

5.    The '777 Patent

Defendants argue that claims 3, 50, and 63 of the '777 patent are invalid as anticipated or obvious. The '777 patent issued June 19, 2001, based on U.S. Patent Application No. 09/115,532 filed July 15, 1998. The '777 patent is titled "System and Method for Remote Postage Metering." Claim 3 describes an apparatus for distributing postage to a number of user processor-based systems in response to their demands. The apparatus stores a value of available postage for each user and deducts from it each new demand before sending the requested postage back to the user. Claim 50 adds the step of the central apparatus validating the demand from the user before approving it. Claim 63 uses a public network to communicate and requires that address information be included in the request and response.

i.    *Scope and Content of the Prior Art*

Defendants' Patent No. 6,233,565 ("Lewis '565") issued May 15, 2001 with a filing date of February 13, 1998. Defendants' '565 patent teaches "[a] system and methods for conducting Internet based financial transactions between a client and a server . . . the client issues a transaction request to the server and the transaction server, in response to a client transaction request, executes an electronic payment

24

transaction at the server." (Lewis '565, abstract.)

As a preliminary matter, Plaintiff argues that Lewis '565 is not prior art because it was not filed either before the invention claimed in the '777 patent was conceived (as required by § 102(a)) or one year before the filing date of the '777 patent (as required by § 102(b)). Plaintiff has not been able to prove by clear and convincing evidence, however, that the invention claimed in the '777 patent was conceived before its July 15, 1998 filing date. Plaintiff submits the declaration of inventor Martin Pagel who states the "conception of the invention recited in the '777 Patent occurred in the second half of 1997, and certainly well before January 1, 1998." Mr. Pagel's uncorroborated declaration, however, is insufficient to establish prior conception. *See Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993) (noting, "the case law is unequivocal that an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof. Throughout the history of the determination of patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism."). Mr. Pagel also submits an "Executive Status Report" dated March 19, 1998 in support of his declaration. But this status report is mostly incomprehensible and has no dates listed other than the March 19, 1998 date when the report was purportedly created, which is still one month after the Lewis '565 filing. Accordingly, Defendants have satisfied section 102(a) because the only date showing the conception of the invention claimed in the '777 patent is the July 15, 1998 filing date, which is after Defendants' filing date of February 13, 1998.

With regard to the scope and content of Lewis '565, the "Field of Invention" section states, "[t]he present invention is directed towards electronic financial transactions between a customer having a personal computer (PC) and a remote service provider via the Internet, more particularly between a large plurality of customer PCs ('clients') and a remote service provider ('server')." (Lewis '565, 1: 7-

13.) Further, Lewis '565 "concerns a system for electronic commerce including at least one user and a remote service provider, an Internet connection between each user and the remote service provider, wherein the user first becomes a registered user, e.g. registering with the remote service provider or with a third party supplier of goods and/or services or both, thereby obtaining a password set, and thereafter executes electronic transactions with the remote service provider using the password set to authenticate the user as a registered user and the remote service provider as an authentic service provider, and receives a secure evidence of payment for each transaction executed including a digital signature and data uniquely identifying the transaction." (Lewis '565, 2: 29-42.)

The 1993 Tygar-Yee article is also prior art. The article has been described in detail above.

> ii.     *Differences Between the Prior Art and the Claimed Invention*

Plaintiff argues that Lewis '565 does not disclose the use of a plurality of cryptographic coprocessors. Plaintiff also argues that Lewis '565 does not reference shorthand information in a demand for postage, as claimed in the '777 patent. Defendants assert that the 1993 Tygar-Yee article teaches that a secure coprocessor can handle simultaneous requests from multiple single-user computers over the network. The 1993 Tygar-Yee article states, "secure coprocessors need to handle only a handful of users." (1993 Tygar-Yee article, section 4.2, p.10.) Defendants also state that Lewis '565 teaches the use of shorthand information in requests because it teaches a system for electronic commerce including at least one user and a remote service provider "RSP", and Internet connection between each user and the RSP where the system includes a Postal Secure Device (PSD) as defined by the IBIP specifications. Each customer's PSD resides at a RSP "server" site and can be accessed only via the Internet and the postal credit is stored on the user's PSD at a descending register. (UF,

158-208, 292-306.)

Taking into account the scope and content of the prior art compared to the disputed claims in the '777 patent, it is clear that the prior art contains enough information to render claims 3, 50, and 63 of the '777 patent invalid as obvious. Moreover, the fact that neither the 1993 Tygar-Yee article nor Lewis '565 were before the USPTO during the prosecution of the '777 patent only bolsters the Court's conclusion.

6.    The '214 Patent

The '214 patent issued May 3, 2005, based on U.S. Patent Application No. 09/644,632 filed August 23, 2000 and is titled "Virtual Security Device." The '214 patent claims a processor-based system that permits a customer to use its computer to make a demand for postage to a remote postage metering device that verifies the demand, assembles a data packet representing the authorized postage indicia, and transmits it back to the customer.

Defendant argues that claims 13, 50, and 89 of the '214 patent are invalid as anticipated or obvious. Claim 13 requires the use of a cryptographic co-processor, which is a portable memory device, to provide security to the transaction. Claim 50 requires that the remote postage metering device use a plurality of virtual secure use devices stored on a bulk storage device and operable on a secure device coupled to the bulk storage. Claim 89 describes the process with the added requirement that the secure memory device return certain data to the unsecured memory of the remote metering device to be stored in a virtual security device.

Defendants contend that U.S. Patent No. 6,868,406 (Ogg-Chow '406) is prior art to the '214 patent. Ogg-Chow '406 issued March 15, 2005, based on U.S. Patent Application No. 09/688,451 filed October 16, 2000. Ogg-Chow '406 is titled "Auditing Method and System for an On-Line Value-Bearing Item Printing System." Plaintiff is the assignee of Ogg-Chow '406.

Plaintiff argues that Ogg-Chow '406 is not prior art because it does not pre-date the '214 patent. Plaintiff states that the inventions claimed in the '214 patent were conceived prior to 1999 whereas the earliest provisional application for Ogg-Chow '406 was filed on October 18, 1999. (UF, 210.) However, as was the case with the '777 patent, Plaintiff's only proof that the invention claimed in the '214 patent was conceived before that of Ogg-Chow '406 is a declaration by Mr. Pagel and an incomprehensible "Executive Status Report" purporting to prove a conception date prior to October 1999. Stated differently, the status report, on its face, is certainly not clear and convincing evidence of invention conception. Therefore, the operative date of conception of that which is claimed in the '214 patent is the filing date of August 23, 2000. And it is undisputed that earliest provisional application for Ogg-Chow '406 was filed on October 18, 1999. (UF, 210.) Therefore, Defendants have satisfied § 102(a), and Ogg-Chow '406 shall be considered prior art.

Aside from the dispute surrounding the date of conception, Plaintiff concedes that Ogg-Chow '406 (and the earliest filed provisional applications) teaches every element and limitation of claims 13, 50, and 89 of the '214 patent. (UF, 211-213.). Accordingly, the Court finds claims 13, 50, and 89 of the '214 patent invalid as anticipated pursuant to 35 U.S.C. § 102(a).

7.    The '451 Patent

The '451 patent issued November 15, 2005 based on U.S. Patent Application No. 09/651,389 filed August 29, 2000. The '451 patent is titled "Method and Apparatus for Printing Indicia, Logos and Graphics onto Print Media." The '451 patent claims a method of printing information on print media, and a method of configuring a commercially available printer to print the information in a particular location or locations on the media, usually the envelope.

Defendants argue that claim 17 of the '451 patent is invalid as either anticipated or obvious. Claim 17 depends from independent claim 16. Rewritten to incorporate

the claim from which it depends, claim 17 reads as follows:

> A system for printing information onto a print media comprising: means for querying one or more databases, containing set up data on one or more printer drivers, to determine set up data for a user's printer; means for performing a printer configuration test to determine said set up data as a function of said query; means for storing results of said printer configuration test in said one or more databases for use by subsequent users; and means for printing said information onto said print media in accordance with said set up data. Wherein the means for querying one or more databases to determine the set up data for the user's printer comprises means for querying one or more databases to determine a printer offset as a function of how the print media is fed into a printer.

(UF, 98.)

Defendants contend that claim 17 is invalid in light of the following three prior art references: (1) Microsoft Word for Windows 95 ("Word 95"); (2) DAZ-zle Designer 97 (version 3.0) and/or DAZ-zle User's Guide (version 2.5); and (3) AddressMate for Windows v2.15.

Plaintiff's primary argument is that the prior art does not anticipate or make obvious "printer offset," as required by claim 17. Plaintiff asserts that "printer offset" is "a variable dependant upon how an envelope is fed into a printer." ('451 Patent, 13: 1-10.) It "may be classified as top offset, center offset, or bottom offset." ('451 Patent, 13: 32-35.)

Defendants assert that Word 95, DAZ-zle, and AddressMate all satisfy the limitation "mean for querying one or more databases to determine a printer offset." For example, Word 95 provides the user with the option of selecting a feed tray position and, once the feed tray position is selected, the information is stored in Windows Registry, which can be queried later to determine printer offset. (Soffer Declar., ¶ 58 & Ex. E at pp.1-7.) Similarly, DAZ-zle allows a user to select how an envelope is fed into a printer and saves that feed option in the Windows Registry or in a layout file, which can be queried later to determine a printer offset. (Supp. Soffer Declar., ¶ 6 & Ex. A; *see also* DAZ-zle User's Guide, pp.2-3.) AddressMate also allows a user to select how an envelope is fed into a printer and to save that option in

template layout files. (Soffer Declar., ¶ 58 & Ex. E at pp.14-20.)

In sum, given the prior art references submitted by Defendants, the Court finds that the "printer offset" function of the '451 patent is far from novel. The three prior art references all address similar needs to that which is accomplished by the "printer offset" function of the '451 patent. Accordingly, claim 17 of the '451 patent is deemed invalid as obvious in light of the prior art.

8.    The '808 Patent

The '808 patent issued January 3, 2006, based on U.S. Patent Application No. 09/651,390 filed August 29, 2000. The '808 patent is titled "Virtualized Printing of Indicia, Logos and Graphics" and describes a method and system for printing information on print media, normally an envelope.

Defendants assert that claims 32 and 39 of the '808 patent should be deemed invalid as either anticipated or obvious in light of prior art references: Word 95, DAZ-zle, and/or AddressMate.  Both claims 32 and 39 utilize a "virtualized sheet," which Defendants argue is nothing more than an image of the envelope to be printed generated by commercially available software, which was described and sold in public long before the '808 patent was conceived. Similar to the claims invalidated in the '451 patent, claims 32 and 39 of the '808 patent pertain to determining a "printer offset as a function of how [] one or more patterns print on a test envelope" and "determining the offset for the selected printer from a printer database having information on one or more printer drivers." ('808 patent, claims 32 & 39.)

Plaintiff argues that both claims 32 and 39 of the '808 patent specify printing a "postal indicia" onto an envelope, which includes printing a FIM bar code  no more than 1/8 inch from the edge of the envelope.  Before the Stamps.com product, Plaintiff contends that customers were forced to print bar codes that where non-compliant or had to buy envelopes with pre-printed FIMs. Plaintiff argues that its '808 patent solved this problem because it developed a mapping process which allowed the FIM

bar code to be printed close to the edge of the envelope. Plaintiff also asserts that the '808 patent requires a printed "postal indicia," which, as described by the Court in its claim construction order, is "postal markings including but not limited to the amount of postage, and FIM bar codes and/or two-dimensional bar codes, printed or imprinted on a mail piece or label."

With regard to the 1/8 inch requirement, the '808 patent states, "[i]n order to conform to the FIM placement standards which require that the FIM consistently be printed 2"+/-1/8" from the right-hand edge of the envelope, the space available between the FIM and the human-readable portion of the indicium changes depending upon the right-hand margin of the printer." ('808 Patent, 14: 21-26.) Both user's guides for DAZ-zle and Envelope Manager prior art discuss the printing of FIM bar codes. And, if there was a requirement that the FIM bar codes be a specific 1/8 inch from the edge of the envelope, it would be an obvious next step to design a program that would print in accordance with an industry standard. Moreover, the AddressMate prior art allows a user to adjust printer margins by very minute (0.001") increments, which would allow a user to print 1/8 inch from the edge of an envelope.

In addition, the DAZ-zle prior art teaches printing a postage designation that includes the amount of postage and an FIM bar code as is clear from Figure 1 of the DAZ-zle User's Guide. This is also apparent from merely looking at the cover of the User's Guide. Accordingly, Defendants have shown by clear and convincing evidence that claims 32 and 39 of the '808 patent are invalid as obvious in light of the prior art.

///

///

///

IV.    CONCLUSION

Based on the above analysis, Defendants have proven invalidity by clear and convincing evidence as to the following claims: Claim 7 of the '597 patent; Claims 7, 42, and 76 of the '991 patent; Claim 35 of the '980 patent; Claim 23 of the '568 patent; claims 3, 50, and 63 of the '777 patent; claims 13, 50, and 89 of the '214 patent; claim 17 of the '451 patent; and claims 32 and 39 of the '808 patent. Accordingly, Defendants' Motion for Summary Judgment of Invalidity is GRANTED and Defendants' Motion for Summary Judgment as to Noninfringement is DENIED as moot. Plaintiff's Motion for Summary Judgment of Literal Infringement is DENIED, and Plaintiff's Motion for Summary Judgment as to Defendants' Affirmative Defenses is DENIED as moot.


DATED:      November 9, 2009


_____

Hon. Otis D. Wright II
United States District Judge